**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kenneth Vincent LEON, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Kimberley HARRISON, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Denise BROWN, Defendant-Appellant.**

**Nos. 72–2264, 72–2027 and 72–2265.**

United States Court of Appeals, Ninth Circuit.

July 19, 1973.

Rehearing Denied in No. 72–2097 Nov. 20, 1973.

Merrill, Circuit Judge, filed opinion concurring in part and dissenting in part.

Charles P. Harrod (argued), San Francisco, Cal., for appellant Harrison.

Frank R. Ubhaus, Asst. Federal Public Defender (argued), James F. Hewitt, Federal Public Defender, San Francisco, Cal., for appellant Leon.

Richard A. Hamar (argued), of Hamar, Lurie & Gaines, San Francisco, Cal., for appellant Brown.

Jerry K. Cimmet, Asst. U. S. Atty. (argued), James R. Browning, Jr., U. S. Atty., San Francisco, Cal., for appellee.

Before MERRILL and KOELSCH, Circuit Judges, and GRAY,* District Judge.

WILLIAM P. GRAY, District Judge:

Denise Brown appeals from her conviction of two sales of heroin; at the same trial, appellant Leon was convicted of having aided Brown in such sales, and appellant Harrison was convicted of possession of a large quantity of heroin with intent to distribute it. We reverse the convictions of Brown and Leon and affirm the conviction of Harrison.

BROWN'S APPEAL. Miss Brown's conviction was based largely upon the testimony of Lionel Stewart, a special agent of the U. S. Bureau of Narcotics and Dangerous Drugs. He testified that, in the course of his work in an undercover capacity, he was introduced to Brown by Glen Marchand (Glen), a paid Government informant, and that Brown, without substantial hesitation, responded to his request to buy heroin by driving away briefly, returning with heroin, and delivering it to him at the price upon which they had agreed.

---

* Honorable William P. Gray, United States District Judge for the Central District of California, sitting by designation.

Brown's defense was that of entrapment by the informant, Glen, and she complains of the failure of the Government to use reasonable efforts to insure his availability at the trial.

Denise Brown, a resident of San Francisco, was eighteen years old at the time of the offense. According to her testimony, which was uncontradicted, she had been the girlfriend of (and in love with) Gus Marchand, the brother of Glen Marchand, the informant. Soon after they began "going together," Brown learned that Gus was a heroin dealer, and from time to time she accompanied him when he made deliveries and when he went to his sources of supply. She insisted that, prior to the acts here concerned, she had never dealt in heroin in any manner, and she appears to have no prior criminal record.

Miss Brown previously had become acquainted with Glen through Gus and had understood from the latter that the two brothers had been working together in dealing in heroin. On September 29, 1971, six days before the sales here concerned, Gus left the motel where he and Brown had been staying, after telling her where he could be reached if Glen came by. Shortly thereafter, Glen did arrive at the motel and asked Brown if she could get him some heroin for a friend named Lionel. She refused, but inasmuch as Glen "seemed like he was in such a big hurry," she offered to try to find Gus for him, and she did drive to various places in San Francisco in furtherance of this attempt.

Brown testified that on October 3, at a time when she knew Gus to be out of town, Glen telephoned her twice and in each instance importuned her to sell him some heroin; she refused. The next day he again called her twice for the same purpose; again she refused. On the following day, October 5, Glen telephoned once more, pleading that he desperately needed the heroin for his friend, Lionel, who would cause him trouble if he could not supply it. She responded that he was just wasting his time in making these requests of her, because Gus did not want her to have anything to do with his business. According to Miss Brown, Glen then said, " 'Well, if Gus says okay for you to do this for me, will you do it,' and I said no. He said, 'Well, you know, he's in trouble and needs money.' " About one-half hour later, Brown received a telephone call from Gus. He said that he was at the courthouse in Los Angeles; that he had just talked to Glen; and that she was going to have to go to his source of supply and get the heroin for Glen, because he (Gus) needed the 'money to pay a fine in order to avoid jail. She asked him how this squared with his prior insistence that she not have anything to do with his "business," and he responded that it was very important and that she was the only one upon whom he could depend "at this time." She thereupon agreed to follow his instructions. Shortly after this conversation, Glen telephoned again and said that he would be over in about half an hour. He came, accompanied by his "friend," Lionel (who actually was Lionel Stewart, the hereinabove mentioned special agent); and the order, procurement and delivery of heroin were accomplished.

It appears that defendant Brown and her counsel did not learn of Glen's informant status until the second day of the trial. Several weeks previously, Brown's attorney had moved before a magistrate for pre-trial discovery of the identities of all informers. However, the Government successfully objected on the ground that there was no showing that the informant was a participant in the crime (although the prosecution's evidence at the trial showed clearly that the informant, Glen, was a percipient witness to the subject sale of heroin). Once counsel for Brown learned that Glen had been a paid informer, he announced that his client's defense would be entrapment and requested that Glen be produced. The trial judge instructed the prosecutor to attempt to obtain Glen's presence in court the following morning. The next

day, the Government reported on its unsuccessful efforts to locate Glen. Narcotics agents testified that Glen was currently working for the Government as an informer in the area covered by the Los Angeles Regional Office of the Bureau of Narcotics and Dangerous Drugs, and that Glen had telephoned such office the preceding afternoon in connection with another case. However, the local officials did not have his address or telephone number, and they knew of no way to get in immediate touch with him although they expected to hear from him during the next day or so. Upon this showing, the court again ordered the Government to "get busy and get that informer up here today or tomorrow." However, Glen never did appear at the trial, and the court implicitly denied Brown's motion that her prosecution be dismissed because of the Government's failure to produce Glen, presumably because the defendant waited until after the trial began before demanding such production.

Of course, if Glen had not been in the employ of the Government, neither his alleged importuning nor his inferred enlisting of the aid of Gus would have suggested any basis for an entrapment defense. It was presumably due to the prosecution's refusal to reveal Glen's relationship to the Government that Brown's attorney was late in asserting such a defense and in asking that Glen be made available.

It is emphasized again that the above recitals with respect to Glen's alleged participation in bringing about the subject sales of heroin stem altogether from Miss Brown's testimony, which the jury presumably did not believe. Whether Glen would have confirmed or denied her story, we do not know. It is worthy of note, however, that one of the narcotics agents testified to the effect that, shortly before the day of the subject sale, Glen told him that if the Government wanted to make a case against Denise Brown, he could do it.

In any event, defense counsel made what, under the circumstances, was a timely request that Glen be produced, and the Government had the obligation to accomplish this or show that, despite reasonable efforts, it was not able so to do. Velarde-Villarreal v. United States, 354 F.2d 9 (9th Cir. 1965). We recognize and reaffirm that "whether there was a failure to expend every reasonable effort to obtain the witness is a question of fact for the trial judge." Velarde-Villarreal v. United States, *supra,* at p. 13. We also assume from the record that the trial judge concluded that, beginning as of the time of the defendant's request, after the trial had begun, the Government did all that it reasonably could to locate Glen and get him into court. However, the testimony of the narcotics agents showed that Glen had been working for the Government from a time prior to the events here concerned and until at least the conclusion of the trial. Several months before the trial, an agent told Glen that he might be needed to testify, but no arrangements were made to insure his presence. In another later conversation, Glen, upon being advised by a narcotics agent as to the date of the trial, said that he did not want to testify against his brother's girlfriend and declined to give his address and telephone number. Apparently, no attempt was made to persuade or direct him otherwise or to condition his continued employment upon his availability as a witness when needed.

We believe that the following observation from the opinion in Velarde-Villarreal v. United States, 354 F.2d 9, 13 (9th Cir. 1965) is equally pertinent here:

"The practice of the Government in employing agent-informers in narcotics cases is well known. We also know that such agents are usually not trained officers—often they are themselves addicts or former addicts. The Government must know that an eager informer is exposed to temptations to

produce as many accuseds as possible at the risk of trapping not merely an unwary criminal but sometimes an unwary innocent as well. One could hardly expect such informants always to stay on the proper side of the line which separates those two cases. And since the Government chooses to utilize such agents, with the attendant risk of entrapment, it is fair to require the Government which uses this inherently dangerous procedure to take appropriate precautions to insure that no innocent man should be punished."

■ We hold that if the Government, in order to "make a case" against an eighteen-year-old girl for the sale of narcotics, hires the brother of her boyfriend to set up the transaction, the "appropriate precautions" referred to in the above-quoted paragraph are not met by concealing the identity of such informant and then waiting until the time of trial before making any substantial effort to have him available to testify.

THE LEON APPEAL. Leon's conviction of aiding and abetting Brown in the sale of heroin was based entirely upon the testimony of narcotics agent Lionel Stewart. According to the latter, Leon was present when Glen introduced Stewart to Brown on October 5 at the Red Roof Restaurant, and Leon observed Stewart hand $800.00 to Brown to pay for an initial purchase of heroin. Stewart further testified that after Brown departed to obtain the heroin, he (Stewart) expressed the hope that she would return with his money or the narcotics, and that Leon responded that she was using his car to go and "score the dope," and that he knew that the quality of heroin would be good because he had previously "dealt" some of it.

Leon denied that he observed or heard the transaction between Brown and Stewart and said that he lent her his car when she asked to borrow it for a few minutes, which had been his frequent practice. He also denied having said anything about heroin while Brown was absent, and he contended that it was

Glen that made comments similar to those that Stewart attributed to him (Leon).

■ Leon (similarly to Brown) now insists that his conviction should be reversed because of the failure of the Government to produce Glen at the trial. Under the factual situation here concerned, the defense of entrapment was not available to Leon, Carbajal-Portillo v. United States, 396 F.2d 944 (9th Cir. 1968), and he thus did not have the same standing to insist upon Glen's presence at the trial as did Brown. However, the relevance of Glen's testimony to Leon's case is obvious, see United States v. Kelly, 449 F.2d 329 (9th Cir. 1971); when he learned at the trial that Glen had been the informer, he joined in Brown's request that he be produced; and if Glen had been present at the trial, as the Government presumably could and should have accomplished because of Brown's entrapment defense, he would have been available to Leon as a witness. Here again, we do not know whether Glen's testimony would help or harm Leon's case. But in view of our conclusion that Brown is entitled to a new trial at which the presence of Glen may be anticipated, and being mindful of the relatively insubstantial nature of Leon's alleged participation, we think that he, too, should have a new trial and a chance to get what benefit he can from Glen's testimony.

HARRISON'S APPEAL. It was to Miss Harrison's apartment that Brown drove on October 5 in order to obtain the heroin that she sold to narcotics agent Lionel Stewart. Having observed this fact, along with other probable cause to believe that heroin dealers were in the apartment, narcotics officers obtained a warrant to search those premises and went there for the purpose of executing it.

As they approached the area, a man named Gaines, who previously had been observed carrying narcotics, left the apartment building. Agent Niblo, the officer in charge, ordered that Gaines be

arrested before the latter could depart the neighborhood. Niblo and other agents then entered the hallway leading to the Harrison apartment. At about that time, they heard a gunshot from a block or so away, which they attributed to the encounter with Gaines. When they came to the apartment door, one of the agents knocked and announced "Police." They waited about ten seconds and, hearing no sound from within, they forced the door and entered. They observed Miss Harrison sitting at a table in the apartment. The subsequent search revealed a substantial quantity of heroin and several guns. Harrison was thereupon arrested, and prosecution followed.

Harrison assigns as error the denial by the trial court of her motions to suppress the items seized in the apartment, on the ground that the entry by the officers was illegal in light of the requirements of 18 U.S.C. § 3109. That statute provides that, in order to execute a search warrant, "The officer may break open any outer or inner door . . . if, after notice of his authority and purpose, he is refused admittance . . . ." [1] Here, the officers, by stating "Police," gave notice of their authority, but they neglected to assert their purpose by adding that they were there to execute a search warrant.

Agent Niblo testified that he was generally aware of the requirements of § 3109. In response to a question by the court as to why he had failed to announce his purpose, he stated:

"Going through these doors is, at best, a very risky situation. I knew there were people coming in and out of that place and I didn't know how many people still stayed in there. I didn't know if they had guns and I presumed—I think there was a reasonably probable presumption there were other guns in there. I didn't want to stand outside that door and make a target any longer than I had to, and in this state of mind I probably forgot—or I'm not saying I did, but I think I forgot to announce the fact we had a search warrant to be served."

■ In holding the search and seizure to be reasonable and valid, the trial court expressed the view that it was to the credit of the officers that they knocked, announced themselves, and waited as long as they did before entering, and that their having forgotten the remaining requirement under the stress of the circumstances was quite understandable. We agree.

In so holding, we are mindful of the general proposition, announced by Justice Brennan in Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), that a breaking is unlawful unless the officer states his authority and purpose for demanding admission. However, that opinion left open the question of whether the unqualified requirements of the rule might be modified by "exigent circumstances," which we believe to be present here. Also, we agree with the view expressed in United States v. Manning, 448 F.2d 992, 1001 (2d Cir. 1971) " . . . that the seeming rigidity of Miller has been tempered by the combined effect of a portion of Justice Brennan's dissent in Ker v. California, [374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963)] and the incorporation of it by reference in Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968)."

Here, unlike the situation in Miller, there was obvious potential danger to the physical safety of the officers; they nonetheless clearly announced their presence and their identities; and it is quite apparent that their having mentioned the search warrant would not have made the slightest difference in the events that ensued.

1. The entire text of § 3109 reads:
"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

In no sense do we intend this decision to be a precedent as excusing anything less than full compliance with § 3109. We only hold that, under all of the circumstances of the present case, the officers acted reasonably, that their oversight was only technical, and that the interests of justice do not require that the search be vitiated thereby.

The conviction of Miss Harrison is affirmed; the convictions of Miss Brown and of Leon are reversed and remanded for a new trial.

MERRILL, Circuit Judge (concurring in part and dissenting in part):

I concur in Judge GRAY's opinion respecting the appeals of Leon and Brown. However, I dissent as to Harrison.

I do not find here any justification for a belief on the part of the officers that they were being refused admission. I find no exigent circumstances otherwise justifying the forced entry. To excuse compliance here invites general disregard of the statute in cases involving narcotics arrests. Accordingly · in my view it was error to deny the motion to suppress.

As to Harrison, I would reverse.