UNITED STATES of America, Appellee,

v.

**Stella YOUNG, Appellant.**

UNITED STATES of America, Appellee,

v.

**Ronnie J. ENRIGHT, Appellant.**

**Nos. 75–2044, 75–2040.**

United States Court of Appeals,
Ninth Circuit.

March 31, 1976.

---

Irma E. Dirst, Asst. U. S. Atty. (argued), Tucson, Ariz., for appellee.

Alex A. Gaynes (argued), Michael J. Brown (argued), Tucson, Ariz., for appellants.

## OPINION

Before ELY and WALLACE, Circuit Judges, and SHARP,* District Judge

MORELL E. SHARP, District Judge:

Young appeals from concurrent sentences received upon conviction on each of three counts of an indictment: Count I, conspiracy; Count II, importation of a controlled substance; Count III, possession with intent to distribute the controlled substance. Enright appeals from concurrent sentences after convictions were entered on Counts I and III. Special parole terms were consecutive.

* Honorable Morell E. Sharp, United States District Judge for the Western District of Washington, sitting by designation.

In these appeals, there are two main issues. The first is whether the seizure of approximately 1,033 pounds of marijuana from a truck after a stop on a highway was made with probable cause. Appellants argue that probable cause could not have existed because there was a break in the surveillance of an airplane suspected of flying the marijuana out of Mexico and into the United States. The second issue is whether the destruction of the seizure by the DEA approximately two months after the seizure without a court order or notice to counsel denied these appellants a fair trial.

We affirm.

The important facts are not in substantial dispute. In the afternoon of August 26, 1974, special agent Kenneth Sul of the Tucson office of the DEA received a tip that some persons operating an aircraft at Freeway Airport in Tucson were acting suspiciously. When agent Sul arrived at the airport, the plane was not there. The next afternoon special agent Herbert Reay received information that the same plane and persons were again at Freeway Airport. Reay spoke with agent Sul and then proceeded to the airport with special agent George Corley. Sul arrived at the airport a short time later. They observed three men loading what appeared to be gasoline cans into a one-engine red and white aircraft with underslung wings. A fourth person, Stella Young, was in a nearby Javelin automobile. Two of the men, Ronnie Enright and Andrew Thomas, came to the auto and conversed with Young. She then got into the aircraft with Thomas and they took off around 5:15 p. m. Enright left the airport in the Javelin. The third male was not identified.

Customs agent Howard Farrington, a pilot, was requested to follow the red and white aircraft from the air. He identified the suspect airplane as a Piper Cherokee. Farrington and the agents on the ground maintained two-way radio communication thereafter.

Enright drove to a private residence. The surveilling agents drove past the residence, where they saw an empty pickup truck with a camper shell near the Javelin. Around 7:00 p. m. three persons left the house and drove away—Enright in the Javelin and John Heffernan and Kurt Rost in the pickup. They were followed at a distance by agents Sul, Reay and Corley to a road leading to an abandoned military airstrip near Picacho, Arizona. The DEA agents then requested and received assistance from the county sheriff's office and the state patrol.

Agent Farrington observed the Piper Cherokee become airborne and followed it into Mexico. At the time the suspect aircraft crossed the border, it was flying at an altitude of no more than two hundred feet. It landed approximately sixty miles south of the border, near Altar, Mexico. Agent Farrington was able to observe his quarry from an altitude of nine thousand feet. From there he saw a truck come to the aircraft. The plane remained on the ground for approximately thirty-five minutes and then took off. It proceeded north toward the border, flying at a very low altitude, sometimes no more than fifty feet off the ground. The plane crossed the border at approximately 7:40 p. m. without asking for or receiving the required Customs clearing. It also operated without any running lights, although darkness was near. A few miles north of the border Farrington lost sight of the airplane because of darkness. He requested assistance from another Customs pilot, Warren Parthen.

Parthen piloted a plane equipped with an infrared sensing device operated by his passenger, Gerald Young. They proceeded to the Picacho airstrip and arrived at 7:45 p. m. Farrington arrived there a little after 8:00 p. m. Around 8:10 p. m. Young detected a Piper Cherokee aircraft approach the landing strip. Although he was able to view the aircraft in darkness with the aid of the infrared sensing device, he was not able to read the airplane's identification number. The suspect airplane landed with the aid of the headlights from the Javelin and pickup, located at opposite ends of the runway. It remained on the ground for

about seven minutes and then took off. Agent Young then observed the Javelin and pickup approach each other and then head toward the Picacho Road beyond the airstrip with the pickup truck in the lead. The agents on the ground could not see this activity. Agent Reay, who was closest to the airstrip, was able to see the lights of the two vehicles a few moments later. The other DEA agents and local officers were gathered near the intersection of Picacho Road and Interstate 10. At the direction of special agent Sul they decided how the two suspect vehicles would be stopped.

A Pinal County Deputy Sheriff, Kenneth Thompson, stopped the pickup truck on Interstate 10 shortly after it entered the highway from the entrance ramp. Special agents McBride and Caton pulled in front of the truck and left their car. Agent McBride, with his gun drawn, went to the passenger side of the pickup and told John Heffernan to leave it. Agent Caton went to the driver side and had Kurt Rost leave the truck and go over to the passenger side. There they were both told to lean against the truck, spread their legs and were frisked. As this was occurring, Deputy Sheriff Thompson arrived to assist the two DEA agents. His gun was drawn and he covered the DEA agents and the suspects. Heffernan and Rost were then placed in McBride's automobile.

By this time, Sul and Corley had stopped the Javelin about a quarter mile behind the pickup. Ronnie Enright and his passenger, Stella Young, were told to leave the automobile and Enright was patted down. Special agent Reay, along with a sheriff's deputy and state patrolman, were also on hand. Reay covered the suspects when Sul and Corley left to go to the pickup. Enright and Young were not told they were under arrest. Apparently, Sul wanted to search the camper first.

Because the headlights from Thompson's car illuminated the rear of the pickup, Sul could see through the uncovered rear window of the camper shell a number of bags with Mexican writing on them. He, McBride and Caton then smelled around the perimeter of the rear entry and detected the odor of marijuana. Sul then entered the vehicle and searched it. Agent Reay was then instructed to arrest Enright and Young.

Prior to trial the district judge denied defense motions to suppress the evidence of the seizure. He found the search valid for either of two reasons: That the stop of the two vehicles was based upon probable cause due to the furtive activities of the Piper Cherokee and the ground vehicles or that the stop of the pickup was made on a founded suspicion and that probable cause existed after the agents saw the bundles in the rear in plain view. The district judge questioned whether Enright and Young had standing to challenge the search made of the vehicle operated by Heffernan and Rost. He did not resolve this issue.

I.

At the outset, we find that Young and Enright each have standing to challenge the search as to Counts I and III. An element of each of those crimes charged is that appellants actually or constructively possessed the marijuana. Young does not have standing with respect to the importation count since possession was not an element of that offense. *See Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Boston*, 510 F.2d 35 (9th Cir. 1974), cert. denied 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975).

We hold that probable cause existed to arrest all four individuals at the time the camper was stopped on Interstate 10. The surveillance of the Piper Cherokee aircraft into and out of Mexico indicated that a crime was being committed. The reasons for this were stated by the district judge at the conclusion of the suppression hearing. Briefly, the significant facts were the altitude of the airplane when it left and re-entered the United States, the rendezvous with a truck in Mexico, the return into the United States without running lights and the failure to ask for required clearance.

In addition, the officers on the ground followed two vehicles to the airstrip, one of them capable of carrying a heavy and bulky load. Agents Farrington, Parthen and Young, in the air, could see those vehicles use their headlights to aid the aircraft in landing. Agent Young determined that the airplane was a Piper Cherokee, the same type that took off from Freeway Airport earlier that day.

These facts, whether observed in the air or on the ground, were relayed to the other agents. Considered together, they add up to provide a reasonable belief that criminal activity was under way.

Appellants argue that probable cause never developed because the agents could not be certain that the plane which landed at Picacho was the same one observed by agent Farrington. This argument is without merit. To say otherwise would require us to ignore the facts presented in the record. Those facts and the reasonable inferences which may be drawn from them lead us to believe that the people in the pickup and the Javelin were awaiting the same aircraft which took off from Freeway Airport.

The fact that agent Farrington arrived over the Picacho airstrip in his plane ten to fifteen minutes before the suspect plane arrived does not trouble us. Testimony at trial and in the hearing on the motion to suppress indicated that the Piper Cherokee had a considerably slower airspeed than the Beechcraft Duke flown by agent Farrington.

## II.

There is nothing in the record to indicate that the destruction of the bulk of the seized marijuana was done in bad faith. We also fail to see how either of the appellants was prejudiced by the failure of the Government to produce the full seizure. Photographs were made of the seizure and samples were taken and preserved through the trial. The jury was properly instructed that it could infer the appellants intended to distribute the marijuana if it found that a large quantity was involved. It was also instructed that it alone was to determine whether the entire seizure was, in fact, marijuana. The jury found against appellants on these questions and we cannot say that the evidence and testimony did not support those findings. This being so, we cannot say that the destruction of the evidence merits reversal or a new trial. However, in affirming this conviction, we do not wish to imply that we approve of the procedure followed by the DEA in its destruction of the evidence. We again suggest that the Government adopt a better procedure for disposing of large seizures of drugs. *See United States v. Heiden*, 508 F.2d 898, 903 (9th Cir. 1974) (concurring opinion).

## III.

We believe that the jury could properly find that appellant Enright had constructive possession of the marijuana, that the chain of custody was not broken and that a conspiracy existed.

AFFIRMED.

ELY, Circuit Judge (concurring):

I concur in the result, and I have no significant quarrel with the majority's reasoning. Nevertheless, I deem it important to mention that I see no relevance in the majority's discussion of the break in the surveillance of the airplane. We have issued many opinions holding that a significant break in the surveillance of a vehicle after the vehicle has been seen to enter this country prohibits a subsequent search of the vehicle on the theory that the search is an extended "border search". I am actually at a loss, however, in perceiving wherein the fact that observing officers have lost sight of a vehicle that has crossed the border can possibly be a factor in determining the existence, *vel non*, of probable cause for a challenged search. I might be able to discern some relevance if, as was not the case here, the break in surveillance had obviously resulted from evasive maneuvering by the operator of the machine at which

the attempted continuous observation was directed.