UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert W. BENEDICT,
Defendant-Appellant.

No. 80–1494.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 16, 1981.

Decided June 8, 1981.

Rehearing Denied July 22, 1981.

Barry J. Portman, San Francisco, Cal., for defendant-appellant.

Cedric C. Chao (argued), Floy Dawson, Asst. U. S. Attys., San Francisco, Cal., on brief, for plaintiff-appellee.

Before GOODWIN and SCHROEDER, Circuit Judges, and PALMIERI,* District Judge.

* Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

PALMIERI, District Judge:

Robert W. Benedict appeals from a judgment of conviction under a one-count indictment charging him and two others with conspiracy to import into the United States from Thailand, and to possess and distribute within the United States, approximately 4.4 kilograms of heroin, in violation of 21 U.S.C. §§ 846 and 963. The case against Benedict alone was tried to a jury before Judge William H. Orrick, and judgment was entered on July 10, 1980. We have discerned no error and we affirm.

In the course of a routine inspection of crates of merchandise destined for export shipment to the United States by Pan American Airlines, officials of the Bangkok Airport Customs Office discovered 4.4 kilograms of heroin concealed in large-model radio sets manufactured in Thailand. The Royal Thai Police, as well as the Bangkok office of the United States Drug Enforcement Administration (DEA), were notified. It was rapidly ascertained that Benedict, an American resident of Bangkok acting under the assumed name of Michael Gillette and posing as an engineer, had participated in the purchase of the radio sets and their use as concealment for the exportation of heroin to the United States. He had acted in concert with one Peter Albert Schoor and Rudolph Hunfeld, both Dutch nationals, who were then en route to San Francisco by air. Both Schoor and Hunfeld were ticketed for Miami, the ultimate destination of the heroin-laden radios. They were arrested at the San Francisco Airport and were subsequently charged along with Benedict in the one-count indictment already described. In the meantime, Benedict, who had been arrested by the Thai authorities for the attempted exportation of heroin, forfeited $40,000 bail and fled from Thailand. Hunfeld became a fugitive on the eve of trial in San Francisco and is still at large. Schoor was tried alone in 1979, and his conviction was affirmed by this court. *United States v. Schoor*, 597 F.2d 1303 (1979). Schoor later testified as a witness for the prosecution at the trial of Benedict after Benedict was located in Canada and extradited. Benedict did not testify and presented no evidence at his trial. He testified at a pre-trial suppression hearing, and Judge Orrick found he was not a credible witness.

## THE CASE AGAINST BENEDICT

The evidence against the appellant at the trial was overwhelming. Construed in the light most favorable to the government as the prevailing party at the trial, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), it can be summarized as follows. Beginning in 1977, Benedict, an American resident of Bangkok, procured heroin for Schoor on three occasions in increasingly larger kilo quantities. The heroin was successfully exported to the United States by surreptitious means. It was disposed of in Miami, which was the center of Schoor's activities. The transaction underlying the indictment took place in 1978 when Schoor, accompanied by his business associate and co-defendant Hunfeld, came to Bangkok to obtain more heroin from Benedict. On this occasion Benedict sold Schoor 4.4 kilograms of high-quality heroin for $40,000 cash. Preparations were then made for its clandestine exportation to the United States by the three individuals involved. After the purchase of the large-model radios from a Bangkok manufacturer, Tannin Industrial Company, the radios were prepared for shipment in Benedict's apartment. The heroin was put in plastic bags which were then placed in the areas behind the speaker components of the radios—one bag in each radio, pushed and molded into the space so that it would occupy the entire area. The speakers were first removed to accommodate the bags of heroin and were then screwed back in place. Benedict, Schoor, and Hunfeld worked together in Benedict's apartment in the preparation of the radios for shipment. Because they were unable to fit all of the 4.4 kilograms of heroin into the radios, 150 grams of heroin remained in the apartment after the radios had been removed for freight handling. The recital of the facts thus far is substantially supported by the testimony of the convicted co-conspirator, Schoor. That

testimony, in the present posture of the case, must be deemed to have been accepted by the jury as credible and was without doubt highly probative of the appellant's guilt.

The search of Benedict's apartment led to the discovery and seizure of the 150 grams of heroin and a number of other items, among them a false passport identifying Benedict as Michael Gillette, screwdrivers, shipping documents, a scale, empty plastic bags, documents indicating a relationship between Schoor and Benedict, glue, paper, and various packing tools. Benedict was arrested by the Thai police. After at first denying his true identity and the presence of anything illegal in his apartment, Benedict made an oral and later a written statement confessing his involvement in the tripartite conspiracy to export heroin to the United States. He revealed the imminent arrival of Schoor and Hunfeld in the United States, which led to their arrest at the San Francisco Airport. A customs search of the persons of Schoor and Hunfeld upon their arrest revealed numerous shipping documents connecting them with various shipments of heroin from Thailand.

Benedict sought unsuccessfully to suppress the use as evidence of any property seized from his apartment pursuant to the Thai search warrant as well as any oral or written statements made by him at the time of his arrest by the Thai police. Judge Orrick conducted a lengthy, painstaking hearing before trial. His findings of fact were not clearly erroneous, and they are accepted by us. *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). His rulings of law were correct.

## THE SEIZURES EFFECTED AT THE BANGKOK APARTMENT OF BENEDICT

■ Appellant argues that the evidence seized from his Bangkok apartment was the product of a joint venture between Thai police and the DEA, and that therefore this evidence must be suppressed because the investigators in Thailand failed to comply with procedures required by the Fourth and Fifth Amendments of the U.S. Constitution. *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). We see no merit in this argument.

The search was initiated by the Thai police under Thai law, and a search warrant was procured from a Deputy Commissioner of the Bangkok Metropolitan Police. The DEA agents were invited by the Thai police to accompany them during the search because the heroin seized at the Bangkok Airport was marked for shipment to the United States.

Concededly, the Thai search warrant did not conform to American constitutional standards. It was issued through Thai police channels. It was not issued by a detached and neutral magistrate as American law requires. See *Coolidge v. New Hampshire*, 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971). However, Benedict's claims of error are disposed of by the factual findings of Judge Orrick and the legal standard he used which is set forth in *Stonehill v. United States*, supra, 405 F.2d at 743:

> Neither the Fourth Amendment of the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials. *Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967). * * * Thus, the Fourth Amendment could apply to raids by foreign officials only if Federal agents so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials. *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927); *Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Symons v. United States*, 178 F.2d 615 (9th Cir. 1949); *Sloane v. United States*, 47 F.2d 889 (10th Cir. 1931).

The lower court found that the Thai authorities alone initiated the investigation

after their discovery and seizure of the 4.4 kilograms of heroin at the Bangkok Airport and that the decision to search Benedict's apartment was made solely by them. The actual seizures, the custody of evidence, and the arrest of Benedict were effected in furtherance of a Thai prosecution of Benedict for violation of the laws of Thailand. The American agents were found by Judge Orrick to have played a passive role, far removed from facts which could justify the conclusion of a joint venture. See *Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir. 1978); *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976); *United States v. Trenary*, 473 F.2d 680, 682 (9th Cir. 1973).

## THE ADMISSIBILITY OF BENEDICT'S STATEMENTS

■ Benedict made an oral statement to the DEA agents on February 11, 1978, the day after the search of his apartment. His claim of error with respect to it is moot because the oral statement was not introduced in evidence. Benedict also made a written confession which, unlike his oral statements, was admitted in evidence. Benedict's assertion of error must also fail here. Benedict testified in a pre-trial hearing in the district court that he made his confession in reliance upon a Thai statute which permits a reduction of sentence where the offender confesses. Judge Orrick found this testimony incredible. Benedict argues on appeal not only that his decision to confess was motivated by the statute but also that in consequence he was subjected to a form of coercion and governmental enticement rendering his confession involuntary. The district court's finding is sufficient to dispose of this claim since it is not clearly erroneous. Additionally, the totality of the circumstances found by the trial court to have existed at the time of his confession are tantamount to a finding of voluntariness. Benedict's free will "was not overborne". See *Davis v. North Carolina*, 384 U.S. 737, 739, 86 S.Ct. 1761, 1763, 16 L.Ed.2d 895 (1966); *United States v. Glasgow*, 451 F.2d 557 (9th Cir. 1971).

## THE USE OF SECONDARY EVIDENCE

■ Because the Thai authorities were prepared to prosecute Benedict and are still maintaining a pending prosecution against him, they have been unwilling to release most of the physical evidence that was seized in Thailand. The 4.4 kilograms of heroin seized at the Bangkok Airport are among the items of evidence which American officials were unable to obtain for use in the Benedict prosecution in the district court. Photographs of the radios and of a bag allegedly containing the 150 grams of heroin were introduced at trial. The 4.4 kilograms of heroin for which there could be no substitute were linked to the sample from the 150 grams of heroin found in the Benedict apartment. This was accomplished by the expert testimony of chemists, which attributed almost the identical degree of purity to the sample in question and to a sample provided to the DEA agents by the Thai authorities from the 4.4 kilograms of heroin confiscated at the Bangkok Airport. The resulting conclusion was that both samples came from the same batch of heroin. It was appraised by a government expert as having a market value in the United States of about $1.5 million after customary cutting.

In short, the government was compelled because of the physical evidence which remained in Thailand to rely on oral testimony, photographs, and photocopies as secondary evidence. Benedict argues that he was denied his Sixth Amendment right of confrontation and was generally prejudiced by this procedure. His confrontation clause claim is based not on the absence of witnesses but rather on the unavailability of physical evidence which allegedly would have helped him in the cross-examination of government witnesses.

There are several answers to this. First, where the government has in good faith attempted to obtain the presence at trial of a government informant as requested by the defense, but the witness nevertheless does not appear, unavailability of the wit-

ness is not grounds for reversing a conviction. *United States v. Hart*, 546 F.2d 798, 799 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 571 (1976); *United States v. Leon*, 487 F.2d 389 (9th Cir. 1973). Here, appellant does not suggest a valid basis for impugning the government's good faith, and we see no reason why the rule should be different when physical evidence, rather than a witness, is unavailable. Second, when the prosecution is unable to obtain a witness from a foreign jurisdiction, it may use reliable secondary evidence as a substitute for unavailable testimony without thereby offending the Confrontation Clause. *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972) (use of transcript of former trial testimony). Here, the appellant was afforded the opportunity at trial to cross-examine witnesses who observed or handled the primary evidence. The testimony of these witnesses provided the district court with the necessary "indicia of reliability" of the photographs and other secondary evidence. *Id.*, at 213, 92 S.Ct. at 2313. Finally, and perhaps most relevant here, are the many cases holding that the unavailability of physical evidence potentially useful to the defense for cross-examination of a government witness does not make the witness's testimony inadmissible. Under these authorities, even if the entire batch of seized heroin had been unavailable at the trial and the defendant had thus been prevented from testing it, this would not present a case of arguable prejudice. See *United States v. Young*, 535 F.2d 484 (9th Cir. 1976), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976); *Munich v. United States*, 363 F.2d 859 (9th Cir. 1966), *cert. denied*, 386 U.S. 974, 87 S.Ct. 1167, 18 L.Ed.2d 135 (1967). It is the person who observed, handled or tested the primary evidence who is the subject of cross-examination, not the evidence itself. As this court said in *United States v. Sewar*, 468 F.2d 236, 238 (9th Cir. 1972), cert. denied, 410 U.S. 916, 93 S.Ct. 972, 35 L.Ed.2d 278 (1973):

"It is the technician who made the test, not the blood sample, who will be a witness against [the defendant]. He will be entitled to cross-examine the technician. The fact that the sample is missing may make cross-examination more difficult, but that does not amount to a denial of confrontation."

The only authority relied upon by appellant for his Confrontation Clause argument is *United States v. Loud Hawk*, 628 F.2d 1139 (9th Cir. 1979) (en banc), *cert. denied*, 445 U.S. 917, 100 S.Ct. 1279, 63 L.Ed.2d 602 (1980). That case involved destruction by state police of evidence seized by them, allegedly dynamite. The only fault attributed to the federal agents was in failing to obtain a sample of the substance before its destruction. Even this fault finds no counterpart in the facts before us. Additionally, under *Loud Hawk*, "the proper balance is that between the Government's conduct and the degree of prejudice to the accused," 628 F.2d at 1152. Here there was no misconduct by the government, and the prejudice to the defendant was either non-existent or minimal. Moreover, the government presented a number of witnesses who saw, handled or examined the physical evidence which was seized in Thailand.

The government witnesses who tested the seized heroin or who saw or examined the large-model radios, the business records of the radio manufacturer in Thailand, the freight forwarding documents related to the shipment of the 4.4 kilograms of heroin, and the numerous objects seized in the Bangkok apartment of Benedict, were all available for the defendant's cross-examination at trial. His rights of confrontation were not impaired. See also *United States v. Ortiz*, 603 F.2d 76, 80 (9th Cir. 1979), *cert. denied*, 444 U.S. 1020, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980); *United States v. Mundt*, 508 F.2d 904, 909 (10th Cir. 1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

■ The introduction into evidence of a copy of Benedict's false passport in the name of Gillette was proper as a duplicate under Rule 1003 F.R.Evid. since there was evidence that the original had been lost in

the State Department after its return by Thai authorities. Appellant's argument that the original might have revealed a customs stamp affording him an alibi is unsupported by any corroborating evidence, and any prejudice allegedly due to the copy is purely speculative. Because there is no credible showing of prejudice, it is unnecessary to decide whether the loss of the original passport by the State Department constituted negligence attributable to the prosecution under *Loud Hawk*. The testimony of DEA agents as to the contents of business documents examined by them in Thailand was admissible as other evidence of the contents of an original document where the original is beyond the reach of process. F.R.Evid. Rule 1004(2). In any case, the business records testimony was merely cumulative, and its exclusion would not have substantially weakened the government's case.

## CONCLUSION

Benedict was convicted on sufficient evidence after a fair and carefully conducted suppression hearing and trial. The judgment of conviction is AFFIRMED.