**UNITED STATES of America**

v.

**Joseph BONNER, Appellant.**

**UNITED STATES of America**

v.

**James TURNER, Appellant.**

**Nos. 88–3042, 88–3043.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 9, 1989.

Decided May 12, 1989.

Frederick S. Young, Washington, D.C. (student counsel), with whom Steven Goldblatt and Dori K. Bernstein were on the brief, for Joseph Bonner.

Lawrence M. Baskir (appointed by the Court), for James Turner.

Andrew Levchuk, Attorney, Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Washington, D.C., Asst. U.S. Atty., were on the brief, for U.S.

Before WALD, Chief Judge, and STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

Dissenting opinion filed by Chief Judge WALD.

STARR, Circuit Judge:

This case requires us to determine whether Metropolitan Police Department officers, in executing a search warrant, complied with the federal "knock and announce" statute, 18 U.S.C. § 3109 (1982). That statute provides in pertinent part:

The officer may break open any outer or inner door or window of a house ...

to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance....

*Id.*

### I

The search at issue was supported by a warrant, the validity of which appellants do not contest. In securing the warrant, a District of Columbia police officer related that a reliable informant had reported that "cocaine [was] being sold from within the [apartment]" in question and described the results of a controlled purchase of cocaine (with additional amounts observed) at that location. A warrant was thereupon issued for "cocaine and related paraphernalia, books ... and other papers relating to the distribution and trafficking in narcotics" inside the apartment.

To execute the warrant, six or more MPD officers presented themselves at the front door of the apartment just before 8:00 p.m. Suppression Hearing Transcript ("Tr.") 63–64. Lieutenant Gales led the search. Investigator Neill stood across from Lt. Gales, also near the door. Lt. Gales knocked three times and announced to those he knew to be within, "Police officers, open up, we have a search warrant." *Id.* at 55. He paused and repeated the procedure. Officer Neill testified that he then heard what sounded like footsteps running from the door. *Id.* at 42–43, 51. Lt. Gales testified that "[i]t seems as though I could hear some faint thumping or bumping inside the premises, and I ordered that the door be forced." *Id.* at 56; *see also id.* at 71, 75.

Using a battering ram, the officers succeeded immediately in opening the door. As the officers entered the apartment, they spotted appellant Bonner moving toward the bathroom and appellant Turner emerging from that room. The toilet was flushing. The officers thereupon arrested appellants and discovered, among other items, scores of vials of crack cocaine and small parcels of powdered cocaine; two sawed-off shotguns and various pieces of ammunition; and more than $6,000 in cash.

Prior to trial, appellants moved to suppress the evidence discovered in the search. They argued that the officers' entrance into the apartment failed to comply with the knock-and-announce statute.[1] Appellants did not challenge the validity of the underlying warrant, nor did they gainsay that the officers gave notice of their "authority and purpose." Rather, their sole argument was (and is) that the officers had not waited long enough between the first notice and subsequent entrance to be, in effect, "refused admittance."

During an extensive suppression hearing, the District Court conducted a reenactment of the events outside the apartment door. That reenactment indicated that eight to nine seconds passed between Lt. Gales' first knock and the end of the second announcement, a result in accord with other testimony. Tr. 56, 93. After that period and before entrance, a few additional seconds passed, during which the officers heard noise from within; Lt. Gales ordered the door knocked down; and the officers rammed the door open and entered. Based on the evidence of record, the District Court concluded that the knock-and-announce statute did not condemn the officers' action. *See infra* note 12. Convicted of possessing cocaine, *see* 21 U.S.C. § 844 (1982 & Supp. IV 1986), and other offenses, appellants now challenge the trial court's conclusion with respect to the officers' entrance. We agree with Judge Sporkin's conclusion that the officers did not run afoul of section 3109 and therefore affirm the convictions.

### II

We believe that the officers' entrance conformed to the standards of section 3109. Even were that not so, we are further satisfied that exigent circumstances obtained so as to justify any deviation from

---

1. 18 U.S.C. § 3109. *See supra* p. 2. While section 3109 applies to searches by federal officers, the District of Columbia commands that its officers comply with section 3109's provisions. *See* 23 D.C.Code Ann. § 524(a) (1981). As previous cases addressing searches by District of Columbia police officers have done, we directly consider and apply section 3109.

complete compliance with the terms of the statute.

### A

As we indicated in the factual narrative, the officers in this case knocked on the apartment door, identified themselves, and stated their specific purpose. It is therefore undisputed that the officers (through Lt. Gales) gave "notice of [their] authority and purpose." 18 U.S.C. § 3109. Appellants' entire challenge rests on the narrow argument that the officers were not "refused admittance," *id.*, before they knocked open the door. They maintain that the officers should have tarried longer at the door before employing the battering ram to secure access to the apartment.

■ It is well established that "the phrase 'refused admittance' is not restricted to an affirmative refusal," *Masiello v. United States*, 317 F.2d 121, 122 (D.C.Cir. 1963) ("Masiello II"), but encompasses circumstances that constitute constructive or reasonably inferred refusal. *See, e.g., id.; see also United States v. James*, 528 F.2d 999, 1017 (5th Cir.) ("Failure to respond within a reasonable time was tantamount to a refusal. A reasonable time is ordinarily very brief."), *cert. denied*, 429 U.S. 959, 97 S.Ct. 383, 50 L.Ed.2d 326 (1976). In making such judgments, courts employ a highly contextual analysis, examining all the circumstances of the case, to determine whether the record establishes the existence of a constructive refusal. *See, e.g., United States v. Phelps*, 490 F.2d 644, 647 (9th Cir.), *cert. denied*, 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

■ Several facets of this case strongly support the conclusion that the officers had, in effect, been refused admittance. First, the officers were searching for drugs and other incidents of drug trafficking. They knew that persons were inside the apartment and gauged their search accordingly. As cases have repeatedly recognized, this type of evidence is peculiarly susceptible to ready destruction. *See, e.g., Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *United States v. Socey*, 846 F.2d 1439, 1445 (D.C.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988).

Second, the officers could reasonably have expected that they were entering into a den of drug traffickers.[2] Those within might reasonably be thought to be unusually attuned to a law-enforcement knock at the door, and ready to respond promptly in one form or another. As common sense, and bitter experience, would suggest, the law has "uniformly ... recognized that substantial dealers in narcotics possess firearms and that such weapons are as much tools of the trade as more commonly recognized drug paraphernalia." *United States v. Payne*, 805 F.2d 1062, 1065 (D.C. Cir.1986) (and cases surveyed, *see id.* at 1065–66.)[3] Once police officers seeking to enter a drug traffickers' enclave have announced their identity and authority, they stand before the door blind and vulnerable. In such a danger-fraught situation, the officers may quite reasonably infer refusal more readily than under other circumstances. *See* Tr. 34–35, 59–60, 66 (fear of harm, entrance with guns and uniform); *cf. United States v. Harris*, 435 F.2d 74, 81 (D.C. Cir.1970) ("The officers prudently came

---

**2.** The dissent accords no weight to this concern, and suggests that we deduce it from the existence of any valid warrant to search for drugs. Diss. op. at 832. Rather, we believe that the particular facts known to the officers and underlying this warrant in this case (an informant's report of trafficking, the controlled purchase, the additional drugs observed, *see supra* p. 823) readily support an inference that the apartment was the site of significant drug trafficking.

Additionally, the dissent suggests that the record supports no reasonable inference that drugs would likely be destroyed. Specific record evidence that those within know of the drugs or have some particular reason to destroy the drugs has never been thought necessary to support the inference of possible destruction (all the less necessary, in this case, considering the evidence supporting the warrant; the delay following the initial notice of purpose and authority; and the noises the officers heard from within).

**3.** And thus in this case the items seized in the apartment included two sawed-off shotguns, which are not commonly employed in recreational activities.

prepared to meet violent resistance.... When the officers knocked on the door, they did not know whether they would be greeted in a normal manner or answered by a hail of bullets."), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971). A fusillade of gunfire from within need not mark refusal.

Third, the warrant process has tested and certified this information. Courts have applied section 3109 to warrantless searches. *See, e.g., Miller v. United States*, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed. 2d 1332 (1958). However, a warrant ensures that officers have had to support, articulate, and swear to their assumptions. And no danger exists that tales of drugs and narcotics trafficking are anything but officers' conclusions formed prior to the search.

Fourth, the officers in this instance twice gave clear notice of their authority and purpose.[4] In view of the officers' knowledge that persons were within the small apartment and the timing of the warrant's execution (early evening hours), this notice renders the ensuing lack of response (during the approximately 10 seconds following the first announcement of purpose) particularly probative of refusal. Under these circumstances, the possibility that those within did not hear or would not respond promptly (if desiring to respond) is slight indeed. *See Jackson v. United States*, 354 F.2d 980, 982 (1st Cir.1965) ("[T]en seconds of silence in this case could mean that the occupant had not even started [toward the door], and hence was not going to.").

Fifth, following their renewed knocking and announcement, officers heard sounds consistent with both refused admittance and destruction of the object of the search.[5] When conducting a search for evidence that is readily destroyed, officers may resolve the ambiguity of a noise from within the place to be searched in a manner consistent with executing the warrant safely and successfully. *See United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir.1973) (given "scampering sounds" heard in drug context, court "unable to say ... that the officers were unreasonable in expecting some positive response to their demand within ten seconds"), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974). "Where, as here, after giving the required notice the officers hear sounds which indicate to them that the evidence sought by the warrant may be in process of destruction, execution of the warrant need not be

---

**4.** The dissent fails to discriminate between this case and those in which officers did not announce their purpose and (or) identity. *See, e.g.,* Diss. op. at 832–833 & n. 5. The distinction between that circumstance and those in this case is important for resolving both whether subsequent lack of positive response might be interpreted as refusal and whether sufficient exigency exists (near-complete compliance with section 3109 requires less exigency to justify entrance than does entry with absence of notice, *see infra* pp. 826–827).

**5.** Our decision rests upon Lt. Gales' testimony, *see supra* p. 823, but readily draws additional support from Officer Neill's testimony that he heard footsteps running from the door. Tr. 42–43, 51; *see also* Tr. 95–96 (Officer Shirk testified that yet another officer, stationed on the battering ram and prior to entrance, commented that he heard noises inside). Some cases appear to rely upon the testimony of all officers stationed outside the door. *See, e.g., United States v. Smith*, 520 F.2d 74, 75 (D.C.Cir.) ("Smith I"), *later proceedings*, 524 F.2d 1287 (D.C.Cir.1975) ("Smith II"); *Masiello II*, 317 F.2d at 122. Even distinguishing between the officer who orders the entrance and others near the door does not render Officer Neill's testimony irrelevant. That testimony might be relevant as elaborating and confirming the noise that Lt. Gales described, and is relevant for confirming that the sounds constituted no positive response (had they done so, Officer Neill might reasonably be expected to communicate that response to the other officers).

The dissent's argument regarding both case law and remand requires a complete discounting of the noises the officers heard issuing from the apartment (as well as a discounting of evidence of drug trafficking and of the officers' delay before entrance, *see supra* note 2; *infra* note 7). Discounting the noise is unjustified. The record reveals no conflict in the officers' testimony, and the trial court credited and relied upon at least one officer's account of the noise within. *See infra* note 12. The trial judge referred to and credited either Gales' testimony (a conclusion far from clearly erroneous and mooting the dissent's qualms) or Neill's testimony (making this an easy case, even by the dissent's standards). This circuit's cases also suggest that the record evidence of the noise within to be quite adequate. *See infra* notes 9, 10.

deferred long enough to allow completion of the process." *Masiello II,* 317 F.2d at 122 (in gambling context, permissible to enter after an officer heard "a rustling or other commotion inside the room").

Finally, the officers waited outside the apartment door for approximately 11 to 12 seconds from the start of their first announcement.[6] All parties agree with this calculation of the period of delay. During that period, the officers received no indication that they would be admitted. In the absence of the foregoing factors, a few additional seconds' delay clearly would have supported the conclusion that the officers had been refused admittance. *See, e.g., United States v. DeLutis,* 722 F.2d 902, 909 (1st Cir.1983) (upholding 20 second delay) (and cases surveyed). When viewed in light of the foregoing factors, the officers' delay before entering supports a reasonable conclusion that the officers had been refused admittance. *Cf., e.g., United States v. Ruminer,* 786 F.2d 381 (10th Cir. 1986) (entrance after 5–10 second delay); *United States v. Davis,* 617 F.2d 677, 695 (D.C.Cir.1979) (15–30 seconds), *cert. denied,* 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed. 2d 244 (1980); *United States v. Wysong,* 528 F.2d 345 (9th Cir.1976) (5–10 seconds); *McClure v. United States,* 332 F.2d 19 (9th Cir.1964) (4–5 seconds), *cert. denied,* 380 U.S. 945, 85 S.Ct. 1027, 13 L.Ed.2d 963 (1965); *Masiello II,* 317 F.2d at 121 (10–20 seconds following announcement).

For the foregoing reasons, we are satisfied that the officers' conduct complied with section 3109.[7] *See also infra* 827–29.

**B**

█ Even were the officers not constructively refused admittance, the circumstances of this case lead us to conclude that exigent circumstances existed to justify their entrance.

A broad range of exigent circumstances has been found to justify less than full compliance with the various requirements of section 3109. *See, e.g., Harris,* 435 F.2d at 74; *Masiello II,* 317 F.2d at 121. The possibility of destruction of evidence and danger to the entering officers constitute two of the most common and compelling bases that establish exigency. For reasons already stated, those two bases figure most prominently in this case. *See supra* pp. 824–25.

Whether the exigency is sufficient to justify the officers' challenged behavior turns upon the extent and nature of the departure that must be justified. The exigency required to justify a warrantless search differs from that required to excuse noncompliance with section 3109's announcement provision. That degree of exigency is, in turn, greater than that needed to excuse noncompliance with only the refusal portion of section 3109. *Accord United States v. Bustamante–Gamez,* 488 F.2d 4, 11–12 (9th Cir.1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

**6.** In evaluating whether there was compliance with the statute, trial courts should not mechanically pursue a "stopwatch" approach (focusing rigidly upon the exact time between initial notice and entrance). Rather, the determination under section 3109 requires a contextual evaluation of various factors, none of which is necessary or inherently predominant.

**7.** Our disagreement with the dissent, rhetoric aside, is quite narrow and concerns evaluation of the record. The Chief Judge objects to our conclusion because she finds in the record no "particularized information available to the police" indicating "flight or destruction of evidence" (or, presumably, danger to the officers). Diss. op. at 834. Had the trial judge only named the officer whose testimony he relied upon (regarding the noise within) and then add-

ed a bare legal conclusion, the case would apparently meet the dissent's standard. *See id.* at 830 n. 1. We rely upon and find in the record several of those factors, any one of which would appear to meet the dissent's test (*e.g.,* evidence allowing the officers to infer drug trafficking, establishing noise inconsistent with admittance, and marking a significant delay before entrance).

The dissent bootstraps its assessment of the state of the record into a characterization of our legal analysis as resting on only a drug warrant and indication of occupancy. *Id.* at 830–32. We trust that despite that characterization, the reader will discern that ours is a contextual understanding of both constructive refusal and exigency that relies upon all the foregoing factors.

In this case, the nature of (and evidence of) the exigency was compelling, and the (assumed) departure from formal legal standards was trivially minor.[8] Great exigency confronted the officers. As we have seen, the possibility of destruction of evidence was clear, and the danger of harm to the officers manifest. The possibility of destruction increased once the officers announced their identity and purpose, and grew as the officers heard nonresponsive sounds within. *Cf. Smith II,* 524 F.2d at 1287 (sounds of "a stirring and sort of shuffling" before entrance to search for drugs, *Smith I,* 520 F.2d at 75, created exigency); *cf. also United States v. Jackson,* 585 F.2d 653 (4th Cir.1978) (simultaneous announcement and entry justified by fear of destruction of gambling evidence). And, as we have already indicated, entrance into a situs of drug trafficking activity carries all too real dangers to law enforcement officers. That danger increased once the officers identified themselves and waited before the door, forced to interpret the import of the sounds within. *See Harris,* 435 F.2d at 81 ("At such a moment we do not think that § 3109 requires police officers to execute a carefully schooled quadrille and await precise proper responses before moving."); *cf. United States v. Leon,* 487 F.2d 389, 394–95 (9th Cir.1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974).

Second, any departure from section 3109's requirements was exceedingly slight. As we recounted before, Lt. Gales twice knocked and gave "notice of his authority and purpose." He thereby satisfied the principal values embodied in section 3109. *See Sabbath v. United States,* 391 U.S. 585, 589, 88 S.Ct. 1755, 1757, 20 L.Ed. 2d 828 (1968). The officers stood outside the door for a period that amply allowed those within the small apartment to open the door or to indicate verbally an intention to do so promptly. Any deficiency in that delay amounted to only a few seconds. This is trivial. Had Lt. Gales paused a few additional heartbeats before ordering the door rammed, no colorable section 3109 claim would exist. In addition, the officers had secured a warrant, eliminating that element of the exigency requirement designed to ensure that the Fourth Amendment's Warrant Clause is not eroded by an exigency too quickly perceived by those called upon to serve on the firing line. *See United States v. Spinelli,* 848 F.2d 26, 30 (2d Cir.1988) (Oakes, J., concurring). The exigency more than justifies this (again, assumed) minor departure from the requirements of section 3109.

## C

Our conclusion marks no departure from the reasoning or result of this circuit's cases. To the contrary, both constructive refusal and exigent circumstances in our case are essentially equivalent to those in *Masiello II,* the (non-narcotics) case which most directly guides us. 317 F.2d at 121. In *Masiello II,* officers sought to execute a search warrant at a suspected gambling site. The officers knocked (crucially, without announcement), 10–30 seconds later knocked and announced, and, after one officer heard "a rustling or other commotion inside the room," entered 10–20 seconds after the announcement. *Id.* at 122. The *Masiello II* court appears to hold that the officers were both refused admittance and confronted with sufficient exigent circumstances to enter. In discussing constructive refusal, the court concluded that when officers hear noise consistent with destruction, "execution of the warrant need not be deferred long enough to allow completion of the process [of destruction]." *Id.* The evidence of gambling, confirmed by the warrant process, and the non-responsive noise also created exigency justifying the

---

**8.** As the following discussion should make evident, *see infra* p. 827 we believe the (assumed, for argument's sake) *degree* by which the officers fell short of being completely and certainly "refused admittance" is relevant for analysis of exigency, and that the degree of departure in this case was extremely slight, even trivial (a matter of seconds). This conclusion does not, of course, mean that we view section 3109's requirement as trivial. *But cf.* Diss. op. at 832.

entrance. *Id.* at 122–23.[9]

*Davis* presented a harder question than that before us. 617 F.2d at 677 (D.C.Cir.). In executing a search warrant in pursuit of drugs, the officers waited 15–30 seconds before entering. *Id.* at 695. While that period is greater (by as little as three seconds) than that at issue here, the surrounding circumstances justified an inference of refused admittance much less than do those in this case. In *Davis,* officers entered at 2:20 a.m., rather than (as here) in the early evening; they knocked upon the door of a house, not a small apartment; and they heard no noise within, but only observed lights inside. *Id.* at 680, 695. This court upheld the entrance. *Id.* at 695. Additionally, *Smith* readily supports our conclusion that exigent circumstances justified the entrance. *See Smith I,* 520 F.2d at 75 (D.C.Cir.) (after announcement, officers heard " 'hurried movement' ... a stirring and sort of shuffling"), *later proceedings, Smith II,* 524 F.2d at 1287 (that noise created exigency justifying entrance); *cf. United States v. James,* 764 F.2d 885 (D.C. Cir.1985) (officers need not comply with section 3109's notice provisions if purpose known to those within); *United States v. Wylie,* 462 F.2d 1178 (D.C.Cir.1972) (same).[10]

Other circuits have reached similar conclusions. *See, e.g., Ruminer,* 786 F.2d at 381 (10th Cir.); *United States v. Garcia,* 741 F.2d 363 (11th Cir.1984); *DeLutis,* 722 F.2d at 902 (1st Cir.); *United States v. Jefferson,* 714 F.2d 689 (7th Cir.1983); *United States v. Tolliver,* 665 F.2d 1005 (11th Cir.), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *Jackson,* 585 F.2d at 653 (4th Cir.); *Wysong,* 528 F.2d at 345 (9th Cir.); *Allende,* 486 F.2d at 1351 (9th Cir.); *McClure,* 332 F.2d at 19 (9th Cir).[11] Our judgment today, upholding Judge Sporkin's disposition, stands in solid company indeed.

## III

Finally, this case is ripe for final disposition. We see no reason to remand the case to the District Court, as the dissent would have us do, either for further development of the record or for additional findings.

---

9. *Masiello II* upheld the officers' entrance based upon the following discussion of the noise within (a passage which could with a change in setting apply to this case):

> The record made on remand shows that ... the officer nearest the door heard a rustling or other commotion inside the room. The original record shows the officers were experienced in gambling cases, familiar with the use by gamblers of 'flash paper' for numbers operations and its physical properties of instantaneous burning without leaving ash. On this record we hold that the findings of the District Court are supported by substantial evidence and must be affirmed.

317 F.2d at 122. The dissent appears to distinguish *Masiello* only upon a possible difference in the corroboration of the existence of the noise within (established by a showing of destruction of evidence). Diss. op. at 830 n. 1. Any such distinction is unduly fine, and the existence of corroboration appears not to have influenced the *Masiello* court. While we doubt that the fact of destruction of evidence discovered after the challenged entrance should determine the propriety of the entrance, evidence of destruction in this case, *see supra* p. 823, would appear to meet the dissent's test.

10. We also perceive no relevant distinction between this case and *Smith* or *Davis. But cf.* Diss. op. at 830 n. 1, 833. *Smith I* did not remand the case to clarify the nature of the noise within. In *Smith I,* the trial court had described facts that could readily apply to this case, finding that officers " 'heard a hurried movement within the apartment, a stirring, sort of shuffling, which one of the detectives considered movement away from the door.' " 520 F.2d at 82. This court remanded for findings of refusal or exigency and conclusions of law. *Id.* at 78–80. Upon remand, the trial court added the bare legal conclusion that the record justified entrance " 'when exigent circumstances suggesting destruction or concealment were created by noises heard inside,' " a conclusion that this court affirmed with little comment in *Smith II.* 524 F.2d at 1287. In like fashion, *Davis,* 617 F.2d at 677, contains no suggestion that the ample support for believing drugs and drug dealers to be within (the basis for the dissent's distinction) allowed an inference of refusal not permissible in this case or that that additional support even prompted the court to sustain the 2:20 a.m. entrance, following the 15–30 second delay.

11. The dissent suggests that these cases reflect circumstances beyond a bare drug warrant and indication of occupancy. Diss. op. at 832–33. Of course, we believe that this case contains relevant, additional circumstances as well. *See supra* pp. 823–26.

The record readily suffices to support our affirmance of the trial court's ruling. As we have discussed, the record fully establishes the predicates of our (and the trial judge's) determination. *See supra* pp. 823–26. We are not called upon to resolve significant conflicts in the testimony or to speculate about the significance of evidence not presented before the District Court. *Masiello I* did, as the dissent reminds us, order a remand, but only because the evidence that might support the trial judge's determination emerged *after* the conclusion of the suppression hearing and conflicted directly with testimony adduced at the pretrial hearing. *See* 304 F.2d 399, 400–02 (D.C.Cir.1962).

Nor need we search beyond the facts that this record clearly establishes. The evidence readily satisfies the objective test we must employ, *see Wylie*, 462 F.2d at 1188 & n. 76, which calls for a *judicial* examination of the record for evidence of the circumstances confronting the officers, and then a *judicial* evaluation whether those circumstances support a legal conclusion of refusal, exigent circumstances, "useless gesture," or other section 3109 issue. *See, e.g., James*, 764 F.2d at 885; *Davis*, 617 F.2d at 677; *Wylie*, 462 F.2d at 1178; *Harris*, 435 F.2d at 74; *United States v. Curtis*, 427 F.2d 630 (D.C.Cir. 1970) (en banc); *Masiello II*, 317 F.2d at 121; *see also Socey*, 846 F.2d at 1445–47 (exigency in warrantless search context). This approach is, of course, common to many areas of the law. The applicable test is frequently stated in terms of how a reasonable and experienced officer would respond to the facts, or it may emerge directly as the court's conclusion. *See Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Socey*, 846 F.2d at 1445–47; *Bustamante-Gamez*, 488 F.2d at 11; *Harris*, 435 F.2d at

81. Courts have presumed that the officers respond to the events as the legal standard compels. *See, e.g., Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action."); *id.* at 135–39, 98 S.Ct. at 1722–24.

Any other course, requiring evidence of the officers' conclusion of refusal, exigency, and the like, would represent an unwarranted extension of judicial oversight. First, courts are not particularly competent to test or evaluate the officers' mental processes, at least compared to their ability to evaluate objective circumstances. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). This evidence is all the more needless because it is of dubious relevance; an officer's subjective judgment can never overcome the lack of an objective basis for the legal conclusion. In addition, in the search context generally, the lack of an appropriate subjective belief does not defeat an officer's objectively reasonable action. *See Scott*, 436 U.S. at 138, 98 S.Ct. at 1723. Finally, such a test would extend judicial micromanagement, oversight, and second-guessing of officers' behavior to far-reaching dimensions, quite beyond that required to ensure compliance with the law (and into the very danger-laden areas where officers must confront the most delicate and dangerous decisions).

There is also no need here for additional findings and conclusions. While the District Court made only skeletal findings and conclusions, the court reached its determination after making findings with respect to the factors that inform our conclusion.[12]

---

12. Following argument, the District Court concluded:

I find that, given all the circumstances in the case, the officers executing the warrant were justified in entering the premises as they did. They followed their proper procedures, they testified today. I find that they are experienced and know how to execute a search warrant. They knocked three times on two

separate occasions. They identified themselves as police officers and stated that they had a search warrant with respect to the premises. One police officer indicated that they heard some movement inside, I think. Therefore, considering the entire record, I find that they were justified in entering the way they did. I find that they acted reason-

More elaborate discussion of the record, and especially greater precision in elaborating the legal standard, would no doubt be preferable in assisting the appellate process, but the record and the District Court's discussion fully permit appellate review. *Cf. United States v. Lindsay*, 506 F.2d 166, 170 (D.C.Cir.1974) (in exigency context, trial court's suppression decision unaccompanied by findings upheld "if there is any reasonable view of the evidence to support it"). Indeed, following an earlier remand, the court in *Masiello II* drew upon conclusions equivalent to those before us. *See* 317 F.2d at 122; *see also Smith II*, 524 F.2d at 1287 (entrance approved after remand upon trial court's addition of bare legal conclusion); *Wylie*, 462 F.2d at 1183–84, 1190 (appellate disposition of section 3109 issue despite "underdeveloped" record and trial judge's decision made without hearing). Addressing this court's ability to decide a procedurally similar section 3109 issue, our colleague, Judge Spottswood Robinson, III wrote in *Wylie:* "Our call ... is to avoid an unnecessary burden on the District Court. To us, the facts and circumstances already of record dictate but one result squaring with the precedents and consistent with common sense." 462 F.2d at 1190. Judge Robinson's wisdom guides us today.

*Affirmed.*

WALD, Chief Judge, dissenting:

As citizens, we owe wholehearted support to law enforcement officials on the front lines in the war against illegal drugs. As judges, our duty is to ensure that our laws continue to govern the conduct of our law enforcement officials. Otherwise we are at risk of losing an even more important battle—the battle to remain a law-abiding society, in the face of law violators as destructive as drug dealers. The majority's rationale renders practically meaningless an essential element of § 3109 in drug search warrant cases, despite the fact that Congress has not seen fit to exempt these cases from its knock, announce, and wait rule. I believe, whatever its wisdom, we must enforce that statute as we find it.

Unlike my colleagues, I think this is a very difficult case, and I would follow the standard procedure this court has laid down for such close § 3109 cases in the past: *i.e.*, require careful factual and legal findings from the trial judge about the circumstances surrounding entry. *See Masiello v. United States*, 317 F.2d 121, 123 (D.C.Cir.1963); *United States v. Smith*, 520 F.2d 74, 78–79 (D.C.Cir.1975). Such findings are absent from this record. Only by continuing, even in crisis, to require that trial judges set out their findings as to what transpired and whether refusal to admit or exigent circumstances did in fact occur in § 3109 cases, can we assure that, until Congress sees fit to take another path, the constraints laid down by the legislature on police entry into private residences are honored.

My reading of the majority opinion leads me to conclude that henceforth police officers armed with a valid search warrant for drugs may forcibly enter a private residence as soon as they have knocked and announced their presence at the door of an occupied apartment, without waiting for any particular length of time afterward to see if a response is forthcoming.[1]

---

ably and, above all, responsibly. Therefore, I deny the motion. Tr. 134–35.

1. I do not read the majority opinion as relying to any significant degree on the nondescript "thumping" sound heard in the apartment to justify entry. If it does, there is definitely conflicting evidence in the record that needed to be resolved by a trial court finding about the nature of the sounds. Two officers testified differently about the sounds within the apartment. Gales, the lead officer who directed the forcible entry, was asked on direct examination about any sounds he heard, and said: "At this particu-

lar time, I can't exactly recall. It seems as though I may have heard...." This testimony was objected to as speculative. Gales then said: "It seems as though I could hear some faint thumping or bumping inside the premises, and I ordered that the door be forced." On cross-examination, Gales was asked whether the sounds he heard were "coming toward the door as if someone were coming to answer it." Gales testified that he "could not tell exactly where it was coming from" and that only after he was inside and saw the layout of the apartment did he decide that the sound had not indicated someone coming toward the door. Asked again on

If, then, a warrant to search for drugs and the knowledge that the residence is occupied is enough to dispense with any

waiting period after the officers' purpose is announced, the statute is effectively cut in two and reduced to a simple knock and enter requirement.[2] Had Congress meant

redirect, "[a]nd the bumping, the sounds that you heard, once you got in, you determined that those were not sounds that had come from that immediate area [from the couch towards the door]," Gales replied, "Well, I did not make that judgment at that particular time. However, in retrospect, I've come to that conclusion." Such ambiguous testimony by itself certainly cannot lend much support to the case for refusal of admittance or even exigent circumstances.

In addition, whatever slight probative weight may attach to what was heard only by an officer other than the one who made the decision to enter, the transcript also suggests that the judge implicitly discredited Neills' testimony that the sound was of "footsteps running from the door." An occupant of the apartment not involved in the arrest testified that the suspects were in the back rooms of the apartment when the knock came; indeed, that is where the police found them seconds later when they forced the door. Consequently, there was no corroboration of Neills' testimony that he heard footsteps running away. *Cf. Masiello v. United States*, 317 F.2d 121 (D.C.Cir.1963) ("rustling" noises suggesting the burning of flash-paper known to be used by gamblers confirmed by burnt paper found on entry); *United States v. James*, 764 F.2d 885 (D.C.Cir.1985) (sound of someone running down back staircase confirmed by discovery of suspect in basement on entry). The trial judge never stated what the evidence established as to the sounds; indeed, he said only that "one police officer indicated that they heard some movement inside, I think." Surely if the judge had been persuaded by Neills' testimony, he would have referred to it more specifically as retreating footsteps instead of "some movement."

In sum, if the "movement" inside is in any way a necessary factor in the majority's calculus, the trial judge should have determined the nature of the sounds at the culmination of a lengthy suppression hearing. *See e.g., United States v. Smith*, 520 F.2d 74 (D.C.Cir.1975) (remand for explicit findings as to refusal of admittance where record contained evidence of ambiguous sounds); *United States v. Smith*, 524 F.2d 1287 (D.C.Cir.1975) (affirmed in light of finding on remand that sounds established shuffling thought to be movement away from door). All we have is the trial court's finding that there was a "movement"—presumably signifying nothing except what the officers already knew, *i.e.,* someone was inside. Indeed, the lead officer testified it was not until he was already inside that he decided the sound was inconsistent with someone getting up to answer the door. Since, if the sounds indicated someone coming to the door, forcible entry would have been barred even under the majority's rationale, the need for specific findings was especially critical

here. Unlike the majority, *see* Majority Opinion ("Maj. Op.") at 826 n. 7, I do not think that requiring specific findings is an empty request for a "bare legal conclusion," *id.;* Maj. op. at 828 n. 10; I am confident that any required finding will be backed up by careful, focused assessment on the part of the district judge who hears the evidence.

2. The majority suggests that I have mischaracterized their legal analysis by indicating that they rely on no particular evidence beyond the search warrant. Maj. op. at 826 n. 7. My point is that the information available to the police here was of the most generic type, likely to be present in every case in which a warrant lawfully issues to search for evidence of drug trafficking. The affidavit supporting the warrant in this case, submitted three days prior to the execution of the search, consisted in relevant part of the following:

> Within the past seventy-two hours this affiant has received information from a confidential and reliable source referred to here after as SE, of narcotic activity to-wit: Cocaine being sold from within the above premises. [Affiant then established SE's credibility and reliability.]
> Within the past seventy-two hours this affiant has met with the above SE, during which it was searched and found free of drugs and money and then driven to the area of the above premises. SE was then given an amount of MPDC funds and let out of the vehicle and then followed to the entrance way of the above premises, where it was observed to enter. A short time past and SE returned to where the affiant was waiting and turned over to the affiant one Sno–Seal packet containing white powder which was searched and found free of drugs and money. SE then related that it went directly to the premises marked 3-4-7-8 and knocked and was let inside by a B/M subject known as James. This subject for the sum of MPDC funds filled the Sno–Seal packet with white powder while the SE waited from an amount which was located on a table. SE then left out and returned back to where the affiant was waiting.

At least that amount of information must be available to the police in any case in which a valid search warrant for narcotics trafficking has been issued. Similarly, the other factors relied on by the majority, *see* Maj. op. at 824–27, will also be present in any drug search case. The panel emphasizes that drugs are easily destroyed, drug dealers often are armed, and those in the drug trade are attuned to the need to respond, with violence or evidence destruction, to the first indication of police presence.

to let it go at that, it would be one thing, but that is not what Congress said. It laid down a second post-knock requirement: that the officers be refused admittance.

The majority repeatedly characterizes this second statutory requirement of admittance refusal as "trivially minor." *See* Maj. op. at 827. Yet in a prior case, this court rejected the notion that proof of refusal was less important once the announcement had been complied with.

> There has been some judicial leaning toward giving less weight to the need specified in section 3109 that admittance be refused before a forced entry than to the need for announcement of identity and purpose. We should be slow to accede to such a judicial interpretation of the statute when it is applied to the execution of a search warrant in the course of investigation of a nonviolent crime, as here [drug distribution], or where urgency is not required to protect anyone from personal danger.... "[T]he Anglo–American tradition of respect for the privacy of the home and the dignity of the citizen even when suspected of criminal behavior forecloses a grudging application of the statute."

*United States v. Smith,* 520 F.2d 74, 81 n. 7 (D.C.Cir.1975). Today, as then, it is not our prerogative, in my view, to read the refusal requirement out of the statute.

The majority stresses the weight of a valid search warrant with its inherent finding that probable cause exists to believe drugs are inside. It follows from that—the

majority reasons—that the occupants will instantly hide them, flee, or prepare to attack the police as soon as they hear the knock. Thus, refusal (or exigent circumstances excusing the refusal requirement), must always be assumed in drug warrant cases. But, § 3109 *presumes* the existence of a valid search warrant, yet insists on the knock and the refusal to admit. And, although drug warrant cases are unfortunately more numerous now, they were definitely not unknown at the time of the enactment of § 3109.[3] Yet Congress did not exclude them from the ambit of the statutory requirement.

Holding that a warrant and indication of occupancy are enough for a forcible entry after knocking and announcing a police presence departs radically from preexisting case law, though my colleagues say otherwise. Every case they cite to bolster the result in this case evidences some significant additional fact, not found in this case. The police here did not, as in *United States v. Allende,* 486 F.2d 1351 (9th Cir.1973), *see* Maj. op. at 825 and 828, execute the warrant just after having personally observed a suspect transport a crate known to the police to contain drugs to the suspect's own residence or, as in *United States v. Harris,* 435 F.2d 74 (D.C.Cir.1970), *see* Maj. op. at 824, after finding an identified getaway car with its engine still warm outside the known residence of an armed robbery suspect. The police here did not, as in *Jackson v. United States,* 354 F.2d 980 (1st Cir.1965), *see* Maj. op. at 825,

---

But all of these factors are generic, true in every execution of a valid drug search warrant. In practice, so is the additional information that someone is inside the premises (it was not known in this case who that someone was or what connection he or she had to the earlier drug sale(s) in the apartment). Finally, I fail to see the significance of the majority's fourth factor, *i.e.,* that an announcement had been made. Maj. op. at 825. Even though the apartment was small and the hour not late, the three seconds between the announcement and the forcible entry certainly was not enough to allow an innocent inhabitant to respond, much less to allow a police officer to conclude that there would be no response. Since I can find no other relevant facts in the record (apart from the ambiguous noises, *see* n. 1 *supra*), it seems to me that the majority does indeed conclude

that execution of any valid search warrant for narcotics trafficking creates a sufficient exigency to allow police officers to enter as soon as they have completed their knock and announcement.

3. The knock-and-announce requirement was first enacted as a general criminal provision under national emergency conditions in 1917 as part of a major and controversial bill designed to aid in detection and prosecution of espionage and arms smuggling to enemy forces during World War I. Congress thus was acutely aware of the applicability of the statute to cases involving weapons and indicated an awareness also of its applicability to cases involving destructible evidence such as opium, liquor and gambling paraphernalia. *See, e.g.,* H.R. 291, 65th Cong., 1st Sess., Cong.Rec. 1,839; 2,070 (1917).

and *United States v. Leon,* 487 F.2d 389 (9th Cir.1973), *see* Maj. op. at 827, wait ten seconds in silence after knocking in order to listen for indications of whether the suspect was going to respond. The police here did not, as in *United States v. Ruminer,* 786 F.2d 381 (10th Cir.1986) and *McClure v. United States,* 332 F.2d 19 (9th Cir. 1964), *see* Maj. op. at 826, 828, see someone run from a room in response to a police knock or observation of police through a window or, as in *United States v. Jefferson,* 714 F.2d 689 (7th Cir.1983), *see* Maj. op. at 828, see someone inside who simply "refused to answer." These officers did not have information that the premises were the home of the primary drug supplier of a known distributor who had that evening completed a purchase as an undercover agent for the police, *United States v. Davis,* 617 F.2d 677 (D.C.Cir.1979), *see* Maj. op. at 826. This search did not culminate an undercover operation in which the suspect had been under surveillance from the time she entered the premises to the time when an undercover police agent completed a purchase of drugs from her, as in *United States v. Wysong,* 528 F.2d 345 (9th Cir. 1976), *see* Maj. op. at 826 and 828, and *United States v. DeLutis,* 722 F.2d 902 (1st Cir.1983), *see* Maj. op. at 828; nor was it conducted directly after an undercover officer had left the premises, ostensibly to get money out of his car, for a drug purchase negotiated with the occupants inside, as in *United States v. Tolliver,* 665 F.2d 1005 (11th Cir.1982), and *United States v. Garcia,* 741 F.2d 363 (11th Cir.1984), *see* Maj. op. at 828. *See also, supra,* n. 1 (distinguishing *Masiello, James and Smith* ). The barren record here is unparalleled in any prior case upholding a forcible entry.

In some cases there was the knowledge that identified suspects were inside the premises with guns or contraband, giving rise to a legitimate inference that they were poised to respond to an announced police presence with violence or evidence destruction.[4] In others, the directly observed behavior or distinguishable sounds of flight or destruction established that the occupants were not going to admit the police officers. In all, there were specific circumstances above and beyond the drug warrant, indicating refusal to admit or an exigency that justified immediate entry. By eliminating the need for any such particularized evidence of flight or destruction in this case, the majority has, in my view, taken a qualitative leap forward from prior precedent and gauged a generic exception for drug cases from the statute's several requirements.

The drug crisis in the District of Columbia, horrifying as it is, is not unique. Other circuits tormented by drug trafficking have refused to create a judicial exemption from the statute for drug cases. The Ninth Circuit has announced no "basis exists for nullifying [a knock-and-announce] statute in all narcotics cases, and, by logical extension, in all other cases involving easily disposable evidence. The statute does not contain the seeds of such far-reaching self-destruction." *Meyer v. United States,* 386 F.2d 715, 717–18 (9th Cir. 1967).[5] As destructive as the drug trade is, we too should resist the temptation to chip away at the statute, remembering Justice Brandeis' admonition that "[e]xperience

---

4. The majority suggests, in its effort to liken this case to *Davis,* that, once the police have probable cause to believe there has ever been a sale of narcotics from a premises, it is irrelevant whether they have further information establishing that those individuals who might see a need to destroy evidence are inside as opposed to innocent residents. *See* Maj. op. at 824 n. 2, 828 n. 10. I find such additional knowledge quite relevant in establishing the likelihood of evidence destruction, especially where, as here, the earlier drug sale took place several days prior to the entry and there is no record that the perpetrator lived in the apartment.

5. *Cf.* Kamisar, LaFave & Israel, *Modern Criminal Procedure* 335–36 (1980) (quoting *People v. Rosales,* 68 Cal.2d 299, 66 Cal.Rptr. 1, 437 P.2d 489 (1968)).

[E]ntry without notice is proper "when the officer acts on a reasonable and good faith belief that compliance would increase his peril, frustrate an arrest, or permit destruction of evidence. Such a belief, however, must be based on the facts of the particular case. It cannot be justified by a general assumption that certain classes of persons subject to arrest are more likely than others to resist arrest, attempt to escape, or destroy evidence."

834

should teach us to be most on our guard to protect liberty when the Government's purposes are beneficient." *Olmstead v. United States,* 277 U.S. 438, 479, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), quoted in *National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. 1384, 1402, 103 L.Ed.2d 685 (1989) (Scalia, J., dissenting). I would remand the record in this case for specific factual and legal findings as to the nature of the sounds heard within the apartment and any other particularized information available to the police on which they might have relied to form a belief that flight or destruction of evidence was imminent. In the absence of such findings, I dissent from the majority's decision to affirm the convictions.