UNITED STATES of America

v.

Timothy GAITHER, Angela Morton, Defendants.

Cr. A. No. 94–370.

United States District Court, District of Columbia.

Nov. 10, 1994.

---

**6**

George Allen Dale, Dale & Mitchell; Amy Seidman, Federal Public Defender for District of Columbia; and James Lawrence Lyons, Kellogg, Williams & Lyons, Washington, DC, for defendants.

James Nelson Plamondon, U.S. Attorney's Office, Washington, DC, for the U.S.

### MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

This matter came before the Court on November 2, 1994 for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and on the defendants' motion to suppress evidence from a search on August 17, 1994. The Court held the *Franks* hearing because defendants claimed that two people on whom Detective James Bradley had relied in his affidavit that was submitted in order to obtain the search warrant allegedly later stated that they had not made the statements cited in the affidavit.

1. The warrant did not, however, refer specifically to narcotics.

2. The defendant's family name is Gaither, not Gaithers, and Mrs. Gaither's first name is Kathryn. There has been some confusion in the case caption and other documents as to the spell-

### Facts

On August 17, 1994, Detective James Bradley completed an affidavit for a search warrant as part of an investigation of the murder of security guard Earl McDaniels. The warrant was for 5929 East Capitol Street, S.E. # 1106, an apartment in the complex where Earl McDaniels was slain. Detective Bradley stated that he was looking for two weapons, a pistol believed to have killed Earl McDaniels and a revolver taken from McDaniels, certain items of clothing and "evidence relating to narcotics trafficking." [1]

Detective Bradley stated in the affidavit that he had spoken with both Joseph Gaither, the defendant's brother and Kathryn Gaither, the defendant's mother on August 17, 1994 outside Mrs. Gaither's home at 5924 Southern Avenue, S.E. [2] According to Detective Bradley, Joseph Gaither had approached him and told him, among other things, 1) that he had seen Timothy Gaither with his nephew Albert Gaither Chapman, a suspect in the murder, 2) that Timothy Gaither had put a gun in Albert Chapman's hands, 3) that Timothy Gaither carried a number of guns in a backpack and 4) that Timothy Gaither was dealing drugs from inside his girlfriend's apartment and was using guns to protect his "drug" business. According to Detective Bradley's affidavit, Mrs. Gaither told him that Timothy Gaither was a bad influence on her grandson, Albert, and that she had seen "numerous firearms" inside Timothy Gaither's girlfriend's apartment at 5929 East Capitol Street, S.E. # 1106.

### Analysis

The defendants moved to suppress the evidence on the grounds that the entry into apartment # 1106 violated the "knock and announce" rule of 18 U.S.C. § 3109 and that the warrant was invalid because Detective

ing of the names of some members of the Gaither family. In this order the Court has tried to spell the names correctly, even if the spelling differs from what was in the affidavit or the original caption.

Bradley's affidavit contained intentionally or recklessly made false statements.

### Eighteen U.S.C. § 3109

The Court heard testimony from Detective James Bradley, a Metropolitan Police Department Officer (MPD), currently on assignment with the Drug Enforcement Administration (DEA) on the REDRUM task force, who executed the warrant. Detective Bradley, a 24–year veteran of the MPD, testified that on August 17, 1994 about 8:00 p.m., he went to 5929 East Capitol Street, S.E. # 1106 with 8 DEA agents. After listening outside the door and hearing nothing, Detective Bradley knocked loudly on the door three times and said "police officer with a warrant, open the door." Detective Bradley then heard "heavy footsteps" just inside the door moving quickly from left to right. He also heard children screaming. After waiting five to six seconds without any response from inside the apartment the police forcibly entered the apartment. Detective Bradley testified that he had ordered the entry team to break down the door because he was concerned about the safety of the entry team. Detective Bradley stated that he considered the fact that he was looking for a suspect in a gun killing and that he believed that there were guns in the apartment.

■■■ Eighteen U.S.C. § 3109 requires that the police announce their authority and purpose and be refused admittance before forcibly entering the premises. Detective Bradley testified that he knocked loudly and announced who he was and his purpose.[3] This Court found his testimony credible. The issue then is whether the police were "refused admittance." The refusal need not be affirmative. See United States v. Bonner, 874 F.2d 822, 824 (D.C.Cir.1989). A court must examine the circumstances of the entry to determine if there was "constructive" refusal.

■■ In this case, the circumstances justified Detective's Bradley decision to force the door. First, he heard the sounds of heavy footsteps near the door immediately after he had knocked and announced. A police officer is in a very different position if he or she hears an adult running inside the premises after the officer has knocked and announced than he or she would be if there were no evidence of anyone being inside. Second, the sound of running footsteps combined with no acknowledgement of the demand to open up may constitute constructive refusal after a reasonable period of time has elapsed. Third, the police were looking for a murder suspect and had been told that numerous weapons had recently been observed inside the apartment.

The police must have the ability to take into account their own safety when they have good reason to believe, as they did here, that there are guns on the other side of the door.[4] While entry has been found improper when the police have hardly waited after knocking and announcing, this is not the case here. See, e.g., United States v. Sinclair, 742 F.Supp. 688, 691 (D.D.C.1990) (Oberdorfer, J.) (finding entry 1 to 2 seconds after knock and announce violated 18 U.S.C. § 3109). After knocking loudly and announcing their presence and purpose, hearing sounds consistent with constructive refusal, and having reason to believe that a murder suspect and a number of weapons might be on the other side of the door, the police decided to enter the premises forcibly. The Court finds this decision proper.[5] See United States v. Barrett, 725 F.Supp. 9 (D.D.C.1989) (Sporkin, J.).

---

3. The defendants did not present any testimony to counter Detective Bradley's version of the facts relating to the officers' entry into the premises.

4. Indeed, the officers did find a cache of weapons in the apartment.

5. According to Detective Bradley, the whole process took about ten seconds. See Trans. of Hearing, November 1, 1994, p 32–36.
   A. We came down the hallway. I went to the far side of the door, banged loudly and yelled, "Police officer with a search warrant. Open the door."
   Q. What if anything did you hear after you banged loudly and announced you're police with a warrant?
   A. I heard heavy footsteps run from my right to my left, by the door, and I heard the screaming of children.
   Q. What was your concern prior to and during the execution of this warrant? What were you concerned with?

## Franks v. Delaware Hearing

■ The Court held a hearing pursuant to *Franks v. Delaware, supra,* to determine whether there were false statements in Detective Bradley's affidavit. Defendants claimed that contrary to Detective Bradley's affidavit, neither Joseph Gaither nor Kathryn Gaither had reported to Detective Bradley that they knew of or had seen guns in apartment # 1106.

The Court heard testimony from Detective Bradley and Special Agents Gabor and Walsh from the DEA, who witnessed the August 17, 1994 interviews with Joseph and Kathryn Gaither.[6] Kathryn and Joseph Gaither also testified, as did investigator Leonard Willis of the Federal Public Defender's Office.

Detective Bradley testified he went to 5929 East Capitol Street, S.E. on August 17, 1994 as part of the investigation of the killing of Earl McDaniels. Joseph Gaither approached him and Detective Bradley asked about "Albert Gaither," whom Joseph Gaither identified as Albert Gaither Chapman. Joseph Gaither told Detective Bradley that he had seen Albert Chapman together with his uncle, Timothy Gaither, and that they had a blue knapsack full of guns. He said that he had seen Timothy Gaither hand a gun to Albert and that Timothy Gaither was a bad influence on Albert Chapman. Detective Bradley further testified that Joseph Gaither told him that Timothy Gaither was dealing drugs out of 5929 East Capitol Street, S.E.

# 1106 and that he had guns to protect his drug business.

Joseph Gaither went to get his mother who appeared shortly thereafter. According to Detective Bradley, Mrs. Gaither also stated that she had seen a blue knapsack and that she had seen guns inside Timothy Gaither's girlfriend's apartment # 1106 in the previous two weeks.

Kathryn Gaither contradicted both the statement attributed to her in the affidavit and Detective Bradley's trial testimony. She denied telling the police officers that she had seen guns in apartment # 1106. Indeed, she testified that she had never been in that apartment.

The Court's credits Detective Bradley's testimony and finds the warrant to be valid. Special Agents Gabor and Walsh, who were present at least during part of the time that Detective Bradley spoke with Joseph and Kathryn Gaither, corroborated the essential parts of Detective Bradley's testimony. Agent Gabor said that Detective Bradley had spoken with Kathryn Gaither for about 20 minutes and that she had told Bradley that she had seen numerous guns in Timothy Gaither's apartment # 1106. Agent Walsh confirmed that Mrs. Gaither had spoken to Detective Bradley about the blue knapsack's containing guns and about having seen guns in Timothy Gaither's girlfriend's apartment.

The Court was particularly impressed with the testimony of Detective Bradley, a 24-year veteran of the MPD. When the Court asked him why he had not sought authoriza-

---

A. The safety—first of all, the safety of the entry team, and the officers involved.
Q. Why specifically in this case would you be concerned with safety?
A. Based on the information that I had gotten from Timothy Gaithers and Kathryn Gaithers, and the fact that Albert Chapman was my primary suspect in the murder of a uniformed security guard.
　　*　　*　　*　　*　　*　　*
Q. What happened after you heard those footsteps from inside of 1106?
A. I waited two or three more seconds. There was no response. I directed the first member of the Heat Team to force the door.
　　*　　*　　*　　*　　*　　*
Q. (the Court) So, how much time would you say between the time you said—(knocks)—and—

A. Five or six seconds.
Q. (the Court) Five or six. So it would be, what, about ten seconds altogether.
A. If that. Eight to ten seconds.

6. Detective Espinosa, a fourth member of the REDRUM task force, who was present on August 17, 1994 was out of the county on November 2, 1994 and did not testify.

tion to search for drugs, he candidly testified there was not sufficient evidence to make such a request. He proceeded carefully in his investigation. He was looking for a murder suspect and weapons. He received information that he believed was reliable from close relatives of the murder suspect. He sifted through the information he obtained. Only after concluding that the information was reliable, did he write a detailed affidavit and proceed to obtain a search warrant.

We are living in difficult times. Drugs and weapons exist throughout the city. Under all the circumstances, the Police acted prudently and properly. The recovery of four potentially killer weapons from a small apartment occupied by a woman and small children clearly defines how serious this problem is. Accordingly, the defendants' motion to suppress is denied.