UNITED STATES of America, Plaintiff,

v.

Keith MURCER, a/k/a Keith Mercer, a/k/a Sholomo Ben Yisrael, Defendant.

Crim. A. No. 93–67–JLL.

United States District Court, D. Delaware.

April 4, 1994.

Richard G. Andrews, U.S. Atty., and Colm F. Connolly, Asst. U.S. Atty., Wilmington, DE, for plaintiff.

Raymond M. Radulski, Wilmington, DE, for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

On December 16, 1993, the grand jury for the District of Delaware returned a four-count indictment against defendant Keith Murcer (a.k.a. Keith Mercer, a.k.a. Sholomo Ben Yisrael) for: (1) knowingly possessing with the intent to distribute more than 5 grams of a substance containing a detectable amount of cocaine base ("crack") in violation of 21 U.S.C. § 841(a)(1);[1] (2) knowingly possessing with intent to distribute a substance containing a detectable amount of cocaine in violation of 21 U.S.C. § 841(a)(1); (3) knowingly carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1);[2] and (4) knowingly possessing a firearm in and affecting commerce in violation of 18 U.S.C. § 922(g)(1).[3] (Docket Item ["D.I."]

1. Section 841(a)(1) provides:
   "[I]t shall be unlawful for any person knowingly or intentionally—
   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance."
   21 U.S.C. § 841(a)(1) (1981).

2. Section 924(c)(1) states:
   "Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years."
   18 U.S.C. 924(c)(1) (1994).

3. Section 922(g)(1) states in relevant part:
   "It shall be unlawful for any person—
   (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... [to] possess in or affecting commerce, any firearm or ammunition."
   18 U.S.C. § 922(g)(1) (1994).

8.) Before the Court is defendant's motion pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure to suppress all evidence seized and all statements made by the defendant, during the execution of a search warrant at 2802 Tatnall Street, Apartment K, Wilmington, Delaware, on December 1, 1993. (D.I. 11.) Defendant contends that the search and subsequent seizure occurred in violation of 18 U.S.C. § 3109 [4] and the Fourth Amendment,[5] and thus all evidence obtained from this search should be suppressed.[6] (D.I. 20.)

## II. FINDINGS OF FACT

This Court is guided by Federal Rule of Criminal Procedure 12(e), which requires the trial court to state on the record its essential findings of fact. Although the search and seizure at issue in this case occurred on December 1, 1993, several incidents which occurred prior to this date are relevant to the pending motion and it is appropriate for the Court to discuss them.

### A. *Background*

During the week of September 26, 1993, Detective Patrick Burke of the Wilmington Police department met with a past-proven and reliable confidential informant, (Confidential Informant ["C.I."] # 1), who has provided information and services that have directly resulted in the arrest of numerous persons for drug offenses. (PX 1.) Detective Burke further stated that C.I. # 1 advised the Wilmington Police that one Sholomo Ben Yisrael would be returning from New York City on September 30, 1993, in the evening hours or possibly in the early morning hours of October 1, 1993. C.I. # 1 provided the police with a detailed description of the defendant to assist them in spotting and apprehending him. C.I. # 1 had direct knowledge that the defendant had contacted a member of his organization and had advised them that he would be arriving in Wilmington on a late train with a large quantity of cocaine and heroin. (PX 1.) C.I. # 1 also informed the police that the defendant sometimes carries a gun. (D.I. 27 at 8.)

On September 30, 1993, several members of the Wilmington police force, including Detective Burke, approached a man matching the description provided by C.I. # 1 after the subject alighted from a train that had arrived in Wilmington at 11:34 P.M. The subject identified himself after being stopped and questioned. The defendant was advised that he was being detained for further questioning, whereupon he was properly Mirandized, handcuffed, and transported to the Wilmington police station. During the course of executing a valid search warrant, the police searched the bag that the defendant was carrying and discovered numerous empty plastic bags, a section of a glass mirror with a white powder residue, a razor, and one small caliber bullet. (PX 1 and D.I. 27 at 3.) The defendant was not arrested, and was subsequently released. During the third week of November, 1993, C.I. # 1 advised the police that Yisrael was residing at 2802 Tatnall Street and that he was still selling large amounts of cocaine. (PX 1.) Also at this time, C.I. # 1 again informed the police that the defendant carried a gun. (D.I. 27 at 4–5.)

---

4. Section 3109 provides:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of a warrant.

18 U.S.C. § 3109 (1985).

5. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

6. Defendant also makes the argument that the search exceeded the scope of the search warrant because the warrant did not authorize a search of the apartment, but only the defendant's person and luggage. This argument is patently frivolous, because the caption of the warrant and the warrant's directive to search "the above named person(s) [and] places" clearly identified the apartment as the place to be searched. Additionally, the warrant referred to the affidavit and application which requested that a search warrant be authorized for a search of 2802 Tatnall Street, Apartment K. (Plaintiff's Exhibit ["PX"] 1.)

During that same week, members of the Wilmington Police Department met with C.I. #2 who had knowledge that Sholomo was living in Apartment K at 2802 Tatnall Street and that the defendant was presently distributing cocaine in Wilmington. Officials at the Wilmington Housing Authority confirmed that there have been complaints lodged against this apartment by other residents who claimed that drug sales were occurring there. (PX 1.)

On December 1, 1993, members of the Wilmington Police Department met with C.I. #2 for the purpose of securing a controlled purchase of cocaine, which occurred at 6:30 P.M., from defendant at 2802 Tatnall Street, Apartment K. (PX 1, D.I. 19 at 18.) The search warrant application was completed around 8:00 P.M. (D.I. 19 at 21.) At approximately 8:30 P.M. on December 1, 1993, members of the Wilmington Police Department assisted by two agents of the Alcohol, Tobacco, and Firearms Bureau (hereinafter "ATF") executed the valid search warrant. (D.I. 19 at 7.) Among the various items recovered were a .38 caliber Taurus revolver and numerous plastic bags containing a white powder substance and a chunky hard white substance. (PX 2.) It is the circumstances surrounding the execution of the warrant, specifically the timing of the entry into the apartment, which form the basis for this suppression motion.

### B. *The December 1, 1993 Search And Seizure*

On December 1, 1993, at approximately 8:30 P.M. in the evening, several members of the Wilmington Police Department and two ATF agents armed with a valid search warrant were positioned in the hallway and stairway in the vicinity of 2802 Tatnall Street, Apartment K. (D.I. 19 at 8.) Sergeant Jubb and Detective O'Connor were first in line and nearest the door. (*Id.*) Detective Burke was several persons back in the line of law enforcement officers that went up the stairs. (*Id.*) Detective O'Connor was carrying a ram-type device which is used to break down the door in the event that the officers are refused entry. (*Id.*) At that point, Sergeant Jubb knocked on the door and yelled, "Police, search warrant." (*Id.*) He then tried to turn the doorknob to see if the door was unlocked. Sergeant Jubb then ordered that the door be breached. (D.I. 19 at 8–10.) The door was opened by the force of the battering ram, the police entered, arrested the defendant, and began conducting the search.

The defendant claims that the police rammed the door before announcing their presence at the door as is required under 18 U.S.C. § 3109, the "knock-and-announce" rule. Defense witness, Yolanda Lum, stated twice that the police knocked or banged on the door and then yelled "Raid!" This indicates that the police did, in fact, knock and announce before entering. Only after a leading question by defense counsel did Lum say that the police yelled "raid" when they were already in the apartment.[7] However, even accepting her testimony as true, which the Court is not inclined to do, the fact that the police declared "raid" when they were in the

---

7. Defense witness, Yolanda Lum, who was also present in the apartment during the execution of the search warrant, testified as follows:
   Q. Tell the Judge, in your own words, exactly what happened when the police came.
   A. We heard a knock on the door. The police said, "Raid."
   Q. Beg your pardon?
   A. We heard a bang at the door, and they said, "Raid."
   Q. Okay. When the police said "Raid," were they already in the apartment?
   A. Yes.
   (D.I. 19 at 34.)
   Defense witness, Tracy Townsend, who was present in the apartment during the execution of the search warrant, testified as follows:

   Q. What happened?
   A. He (defendant) was on the phone, and I was just sitting there watching TV. And the door came in.
   Q. When you say the door came in, what happened? How was it—
   A. Somebody—the police knocked the door down, knocked the door in.
   Q. Do you recall anything being said through the door by anyone prior to the door being knocked down?
   A. No. Once they came in they said, It's a raid, or, It's the police, or whatever they said. But it was once they got inside.
   (D.I. 19 at 31–2.)

apartment does not mean that they did not also announce their presence before they entered. Sergeant Jubb testified that he waited approximately two to three seconds after announcing his presence and purpose before having the door rammed. (D.I. 19 at 42.) The Court lends credence to Sergeant Jubb's testimony and finds as a matter of fact that the police officers did indeed wait two to three seconds after announcing their presence before breaching the door.

## III. DISCUSSION AND CONCLUSIONS OF LAW

### A. Applicability Of § 3109 (The Knock–And–Announce Rule)

The Government contends that the knock-and-announce rule only governs the execution of a federal warrant by federal officers. Since the warrant that was obtained in this case was issued by a state judge upon the application of state law enforcement officials, the Government argues that the search does not have to conform to the statutory guidelines set forth in § 3109. (D.I. 22 at 6.) The Third Circuit has observed that, "there is no federal statute governing the execution of warrants by state officers." *U.S. v. Stiver*, 9 F.3d 298, 301 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1115, 127 L.Ed.2d 425 (1994). Other courts have recognized that "[s]ection 3109 regulates execution of a federal warrant by federal officers, but does not govern the conduct of state or local police officers executing state warrants." *U.S. v. Andrus*, 775 F.2d 825, 844 (7th Cir.1985).

The question before the Court then is whether the presence of two ATF agents at the scene of the search and seizure is sufficient federal involvement to transform this otherwise "state" operation into a "federal" endeavor. The Government argues that the mere presence, without more, of two ATF agents during the execution of a state search warrant does not render the search "federal" and does not trigger § 3109. In support of its assertion, the Government relies on *U.S. v. Bedford* which provides some guidance as

to the relevant factors to examine when attempting to ascertain whether a search was "state" or "federal" in nature. The Court in *Bedford* reasoned:

> Whether a search conducted pursuant to a state warrant is characterized, in a federal prosecution, as "federal" or "state" depends upon the extent federal officers were involved in the search and seizure. Each case will turn upon its own particular facts, but something more than "mere participation" by federal officers must be found before a state search is transformed into a federal undertaking.

\* \* \* \* \* \*

> [W]e are more inclined to view the search as a "state" undertaking in which federal agents participated solely to supply additional manpower for the execution of the warrant. A number of facts support this position: (1) the warrant was issued under state law and directed to state officers; (2) the warrant was predicated on probable violation of state narcotics laws; (3) there was no evidence of bad faith on the part of either the state or federal officers; (4) federal agents did not assist in the obtaining of the warrant; (5) there was no evidence that federal agents instigated or supervised the search; (6) defendant was initially arrested by local police officers; (7) the majority of the evidence was found by local officers; and (8) the products of the search, placed in the custody of local police, formed the basis of a state prosecution.

*U.S. v. Bedford,* 519 F.2d 650, 654 n. 1 (3rd Cir.1975), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976).

Although *Bedford* did not deal with the applicability of § 3109, but rather the applicability of Fed.R.Crim.P. 41,[8] the Court finds the argument compelling, because in both situations, the underlying question is the issue of admissibility in a federal prosecution of evidence seized under authority of a state search warrant executed by city and federal law enforcement officials. The Court sees no

---

**8.** Fed.R.Crim.P. 41 deals generally with searches and seizures and more specifically with the is-

suance of search warrants.

justification for limiting the reasoning of *Bedford* only to cases dealing with the issue of Fed.R.Crim.P. 41.

■ Applying the analysis of *Bedford* to the case at bar militates against finding that the search was "federal" in nature. First, the warrant was issued by a state Superior Court judge and was directed to two police officers in the Wilmington Police Department.[9] Second, the warrant was predicated on a probable violation of Delaware narcotics laws. Third, there was no evidence introduced by the defendant to indicate bad faith on the part of the local law enforcement officials or the ATF agents. Fourth, two local officers obtained the warrant without the assistance of federal agents. Fifth, there was no evidence presented by the defendant to suggest that ATF Agents Clowry or Hnat instigated or supervised the search. Sixth, the defendant was initially arrested by Detective Burke of the Wilmington Police Department. Seventh, the majority of the evidence was found by Detectives Burke and Vietri of the Wilmington Police Department. Eighth, the products of the search, as outlined in the search warrant return, are in the custody of the Wilmington Police, although admittedly, the evidence will form the basis of the federal prosecution. Additionally, in *Bedford*, there were eight local officers and four federal agents. Here, there were approximately eight local officers and only two federal agents. Finally, any alleged misconduct that occurred was carried out by local, and not federal, officers. Defendant has failed to offer any proof which suggests that the Wilmington Police were coaxed into violating the knock and announce requirement by the ATF agents or that the ATF agents violated the rule.

Thus, the only evidence before the Court which suggests federal involvement in the search was: (1) two federal agents were present when the door was breached; and (2) the evidence seized will form the basis of a federal prosecution. This Court holds that the amount of federal involvement in the search was insufficient as a matter of law to term it a "federal" search. There can then be no violation of § 3109, because § 3109 does not govern the search and seizure at issue in this case.

## B. *Exigent Circumstances Exception To § 3109*

Assuming, however, that it is later determined that § 3109 does apply to the search and seizure at issue, the Court is compelled to discuss whether a violation did occur. The knock-and-announce rule simply stated requires law enforcement officers executing a warrant to announce their presence and purpose before attempting to enter the premises. 18 U.S.C. § 3109. The Third Circuit has recognized three goals served by § 3109:

> First, it reduces the likelihood of injury to police officers, who might be "mistaken, upon an unannounced intrusion into a home, for someone with no right to be there." Second, it seeks to prevent needless damage to private property. Finally, it embodies respect for the individual's right of privacy, which is to be imposed upon as little as possible in making an entry to search or arrest.

*U.S. v. Nolan*, 718 F.2d 589, 596 (3rd Cir. 1983) (citations and footnote omitted). *See also U.S. v. Kane*, 637 F.2d 974, 977 (3rd Cir.1981).

The normal procedure is for the police to knock on the door of the dwelling and announce their presence and purpose—"Police. Search Warrant." After actually being denied entry, the police may use force to achieve entry. The police may also be con-

---

9. The testimony of Detective Burke is as follows:

Q. What agency was investigating 2802 Tatnall? I mean what police agency?
A. Wilmington Police.
Q. Was ATF involved in the investigation of 2802 Tatnall?
A. No.
Q. At what point did you ask somebody from ATF to participate in the execution of a search warrant of the apartment?

A. It was on the day that we conducted the raid..
Q. Did anybody from ATF provide you with the information that's contained in the search warrant?
A. No.
Q. Did anybody from ATF or any other federal agency help you write the search warrant?
A. No.
(D.I. 27 at 6.)

structively denied entry after waiting a sufficient amount of time and receiving no response. *U.S. v. Bonner*, 874 F.2d 822, 824 (D.C.Cir.1989) (stating that " 'refused admittance' is not restricted to an affirmative refusal, but encompasses circumstances that constitute constructive or reasonably inferred refusal") (citations omitted). In the case at bar, there was no affirmative refusal by the occupants of the apartment after the police knocked and announce their presence. Assuming *arguendo* that a wait of two to three seconds is not a reasonable amount of time to wait before the police may determine that they were constructively refused admittance, the Court must next consider whether there were sufficient exigent circumstances to justify noncompliance with the statute.

Courts have recognized a number of exceptions which excuse compliance with the knock-and-announce rule. Among these exceptions are: (1) when the officers have reason to believe that the destruction of evidence is being attempted; and (2) when the officers have reason to believe that announcing their presence might place the officers executing the warrants in physical danger. *Nolan*, 718 F.2d at 596. *See also Bonner*, 874 F.2d at 826 (D.C.Cir.1989) (arguing that "[t]he possibility of destruction of evidence and danger to entering officers constitute two of the most common and compelling bases that establish exigency"). Evidence which is obtained while exigent circumstances are present will not be suppressed.

### 1. *Destruction of Evidence*

At the suppression hearing, the Government elicited testimony from Detective Burke which indicated that drug dealers often attempt to flush or dispose of their drugs when they know that the police are present.[10]

The Government concedes that it possessed no specific evidence pertaining to the defendant which suggests that *this* defendant would likely destroy the drugs if he knew that the police were present. However, the Government has pointed to a growing trend in the circuits which finds exigent circumstances more likely to be present in searches involving narcotics. This so-called "blanket rule" exception to § 3109 relies on the notion that it is reasonable for law enforcement officials to assume that suspects selling illegal drugs in small quantities from a residence that has normal plumbing facilities will attempt to destroy the drugs if they are aware of the officers' presence. *See Bonner*, 874 F.2d at 824 n. 2 (D.C.Cir.1989) (noting that "[s]pecific record evidence that those within know of the drugs or have some particular reason to destroy the drugs has never been thought necessary to support the inference of possible destruction"); *U.S. v. Moore*, 956 F.2d 843, 850 (8th Cir.1992) (holding that "[i]t is reasonable for police officers to assume that suspects selling illegal drugs in small quantities from a residence that has normal plumbing facilities will attempt to destroy those drugs if officers knock before a search warrant is executed"); *U.S. v. One parcel of Real Property*, 873 F.2d 7, 9 (1st Cir.), *cert. denied, Latraverse v. U.S.*, 493 U.S. 891, 110 S.Ct. 236, 107 L.Ed.2d 187 (1989) (stating that "[t]he fact that the officers had probable cause to believe that the occupants possessed cocaine, a substance that is easily and quickly removed down a toilet is additional justification for the shorter wait before entry"); *U.S. v. Tolliver*, 665 F.2d 1005, 1008 (11th Cir.) (holding that compliance with § 3109 was excused due to exigent circumstances, because "the announcement of identity and purpose would have

10. Detective Burke has been a member of the Wilmington police department for over ten years and has been involved in approximately 600 to 700 drug investigations. He has attended drug-type schools as part of his training and has been involved in several hundred search warrant executions involving investigations of cocaine and cocaine base ("crack"). (D.I. 19 at 4–5.) His testimony is as follows:

> Q. The question is, based on your experience and training and that of the other officers who participated in the execution of the warrant,

do you have an opinion as to what drug dealers might do in the event that police knock on their door and announce themselves as police.
> A. From my experience I've had people that have flushed dope before and disposed of it, along with making attempts to grab weapons.
> Q. And was that opinion—did that factor into your decision to ram the door after you had knocked and announced yourselves and didn't receive an answer?
> A. Absolutely.

(D.I. 19 at 10.)

jeopardized the availability of evidence (the cocaine) which the agents knew to be inside"), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982); *U.S. v. Jackson,* 585 F.2d 653, 662 (4th Cir.1978) (holding that search for gambling slips which were easily susceptible to destruction created exigent circumstances permitting "simultaneous" entry);[11] *Rodriguez v. Butler,* 536 F.2d 982, 986 (2d Cir.) (noting that announcement is excused where the contraband (narcotics) is by its nature readily destructible, the quantity was such that destruction could be quickly accomplished, and the belief that narcotics were in the premises to be searched was reasonable), *cert. denied,* 429 U.S. 943, 97 S.Ct. 362, 50 L.Ed.2d 313 (1976); *U.S. v. Gardner,* 553 F.2d 946, 948 (5th Cir.1977) (observing that cocaine is "a powder which can easily be flushed down a toilet"), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978).

However, there are several circuits which hold that suspicion that drugs are present, in and of itself, is not sufficient to warrant an unannounced search. *U.S. v. Likas,* 448 F.2d 607, 609 (7th Cir.1971) (stating that possible destruction of evidence is insufficient to condone the officers' actions which were in violation of § 3109); *U.S. v. Wulferdinger,* 782 F.2d 1473, 1476 (9th Cir.1986) (holding that the "probable presence of contraband does not itself create exigent circumstances"); *U.S. v. Stewart,* 867 F.2d 581, 585 (10th Cir.1989) (noting that non-compliance with § 3109 will not be excused where the officers' decision on the mode of entry is based on generalities about drug dealers "that bore no relation to the particular premises being searched or the particular circumstances surrounding the search").

■ This Court is inclined to adopt the blanket rule which holds that when the form and the quantities of drug suspected to be present increase the likelihood that they can

be readily destroyed, the police officers may dispense with the requirements of § 3109. In so holding, the Court understands this view to be consistent with prevailing Third Circuit precedent below.

■ In *Nolan,* federal officers entered the defendant's hotel room with a passkey, and upon discovering that he was not there and observing what appeared to be drug paraphernalia in the room, they exited and waited for the defendant to return. When the defendant returned, the officers again entered the hotel room with a passkey. The district court found that the officers had a reasonable belief that the drug paraphernalia they had seen during their first entry would be in jeopardy of destruction if the defendant knew he was about to be arrested. The exigent circumstance justifying the second entry was fear that the evidence would be destroyed by flushing it down the toilet in the bathroom which was in close proximity to the room where the paraphernalia was located. *Nolan,* 718 F.2d at 597–98. The officers in *Nolan* were virtually certain that the items in the room were illegal contraband and would be present in the premises when they commenced the second unannounced entry. Likewise, in the instant case, a controlled buy had occurred at Apartment K just two hours prior to the search. It was reasonable for the officers to be confident that there were still drugs on the premises because of the recent purchase of drugs in that location. Additionally, the plumbing facilities in both the bathroom and kitchen of the apartment made the drugs easily susceptible to destruction if the police waited after announcing their presence.

After considering the current trend in the various circuits and the reasoning of *Nolan,* as well as the arguments made by the parties, this Court concludes that the reasonable probability that drugs would be found on the premises[12] combined with the ease which the

---

11. A "simultaneous" entry occurs when the door is breached at the same time that the announcement is made by the officers.

12. The following factors contributed to the reasonable conclusion that there would be drugs present on the premises: (1) C.I. # 2 informed police during the investigation that the defendant

was distributing cocaine in Wilmington and resided at Apartment K; (2) The police with the assistance of C.I. # 2 had completed a controlled buy approximately two hours earlier; and (3) Several complaints were made by residents of the apartment building who informed the Wilmington Housing Authority that drug sales were occurring at that location.

cocaine could have been destroyed creates sufficient exigent circumstances to justify an unannounced entry.

### 2. *Physical Danger to Police Officers*

The Court appreciates the fact that law enforcement officials are always uncertain of what lies behind the door on which they are required to knock. They may be met by a young child or they may encounter a fusillade of gunfire from the automatic assault rifles of a gang of drug dealers. Far too often in cities throughout the United States, when a magistrate signs a search warrant, he or she is also unwittingly signing the death certificate of the officers who are executing the warrant. As noted previously, courts have recognized an exception to the knock-and-announce rule when police have reason to believe that inhabitants of the occupied premises may be armed with weapons. Detective Burke testified that he had been informed by the C.I. # 1 prior to the October 1st train stop and during the third week of November that the defendant sometimes carries a gun. (D.I. 27 at 7–8.) Agent Clowry testified that it was common for drug dealers to have weapons and he knew of situations where officers were shot through the door while executing a search warrant.[13] (D.I. 19 at 28–29.)

Recently, the court in *State v. Stevens* reflected on the purpose of a knock-and-announce rule in light of today's rampant drug culture. The police, after attempting to gain access via a pizza delivery ruse, then announced themselves as police officers and waited two to six seconds before breaching the door. In finding the presence of exigent circumstances, the court noted:

> Historically, the primary purpose of the rule of announcement was to decrease the potential for violence when the police execute a search warrant. This rule of announcement rationale . . . is no longer valid in today's drug culture. In fact, by announcing their presence, police may ac-

tually increase the likelihood for violence. Due to this "systemic" violence aimed at the police and rival drug dealers, when the police execute a search warrant, they may be putting themselves in more danger, rather than less, by announcing their presence before they enter. . "The element of surprise attending an unannounced entry allows the officers to enter and secure the premises before the suspect is able to gather his or her thoughts and possibly gun down the officers as they attempt to identify their presence and purpose." (Citing *State v. Williams,* 168 Wis.2d 970, 985–86, 485 N.W.2d 42 (1992).)

*State v. Stevens,* 181 Wis.2d 410, 511 N.W.2d 591, 596–97 (1994).

In *Kane,* federal agents following an informant's tip, raided the defendant's house in search of drugs and chemicals used to manufacture drugs. Prior to the search, the police were also informed that four weapons were present in the house. The police entered using a ruse and failed to announce their presence. The Third Circuit, upholding the unannounced search, found that, "a police officer's reasonable belief that announcement might place him or his associates in physical peril constitutes another 'exigent circumstance.'" *Kane,* 637 F.2d at 978 (3rd Cir. 1981). In *Singer,* although the information was in excess of 6 months old, the court found that exigent circumstances existed to justify a no-knock entry where the police had received two anonymous tips that the defendant sold drugs and had received a report from a community anti-drug group which stated that the defendant possessed firearms. The detective on the case also testified that drug dealers often possess weapons. *U.S. v. Singer,* 943 F.2d 758, 759, 762 (7th Cir.1991). *See also U.S. v. Buckley,* 4 F.3d 552, 558 (7th Cir.1993) (stating that if the officers reasonably believe that knocking and announcing would heighten risks to their safety, the officers may enter without knocking), *cert. de-*

---

13. Agent Clowry testified as follows:

Q. And you're concerned for your safety?
A. Yes. I'm concerned about actually being anywhere near the front of the door because I know people have been shot through the doors before, from my training and experience.

(D.I. 19 at 28.)

Detective Burke Clowry further stated that, excluding this raid, during the past six months, he had participated in nine drug arrests and seven of those arrests yielded weapons. (D.I. 27 at 15.)

*nied, Herman v. U.S.,* —— U.S. ——, 114 S.Ct. 1084, 127 L.Ed.2d 400 (1994). Other courts have noted that drugs and guns are often present together as it is common for drug dealers to use weapons to protect themselves from other drug dealers as well as the police. *Bonner,* 874 F.2d at 824 ("substantial dealers in narcotics possess firearms and ... such weapons are as much tools of the trade as more commonly recognized drug paraphernalia"). Indeed, Congress recognizes the dangerous synergistic effect of drugs and guns by providing enhanced penalties anytime a defendant possesses a firearm during a drug trafficking crime. 18 U.S.C. 924(c)(1).

■ In the case at bar, the police were aware from a past-proven and reliable confidential informant's tip on two separate occasions (one just a week prior to the search in question) that the defendant sometimes carried a gun. This coupled with the fact that a small caliber bullet was retrieved from the defendant when he was detained on October 1, 1993, is sufficient for the police to have reasonably assumed that the defendant may be armed. If the police chose to knock and announce their presence, as this Court has found, so much the better. However, exigent circumstances certainly existed to excuse any requirement of alerting a possibly armed drug dealer. This Court finds, based on the credible evidence, that the reasonable probability that the defendant might be armed (combined with the realistic assessment that many drug dealers carry guns) created sufficient exigent circumstances to justify, and necessitate, even an unannounced entry.

### C. *Fourth Amendment*

The fact that § 3109 does not apply to the case at bar or that there were exigent circumstances to excuse compliance with that statute does not end the Court's inquiry as to whether the search was violative of any of the defendant's rights. Though § 3109 is inapplicable or compliance with it is excused, the Court must turn to the guarantees provided by the Fourth Amendment to insure that the defendant's constitutional rights are safeguarded. *Stiver,* 9 F.3d at 301–02; *see also Singer,* 943 F.2d at 761 (holding that "evidence seized by state law enforcement officials is admissible in a federal criminal prosecution [only] if it is obtained in a manner consistent with the protections afforded by the United States Constitution"). The Third Circuit has stated that, "the Fourth Amendment does not impose a specific rule governing forced entries to execute search warrants but rather imposes a *general requirement of reasonableness,* informed by the goals of preventing undue invasion of privacy and destruction of private property." *Stiver,* 9 F.3d at 302 (emphasis supplied).

■ Examining the facts of this case, the Court is convinced that the search and seizure here was reasonable. First, although the search occurred at 8:30 P.M., the search was still a daytime search under federal law.[14] There was little danger that the defendants would be awakened from a deep slumber to find themselves surrounded by police officers. Second, although the officers may not have waited a sufficient amount of time for a response to their knock, they did announce their presence and purpose before smashing down the door. Third, the officers had a valid warrant for a search of the premises and ample grounds to believe that drugs were present at the apartment.[15] Fourth, the police had reason to believe that the defendant was armed. As stated in *Stevens:*

> Even under the rule of announcement, after the police have announced their identity and purpose, the occupants must let them in ... The occupant's privacy interests are limited to knowing the police are entering and perhaps effecting the method of entry. The occupants do not have the right to refuse entry. We balance this limited privacy interest against two other interests—the public's substantial interest in stopping or at least curtailing the drug trade and its related crimes, and the police officers' interest in protecting themselves and others from harm. When the police execute a search warrant for evidence of

---

**14.** Fed.R.Crim.P. 41(h) defines a "daytime" search as occurring between 6:00 A.M. and 10:00 P.M. local time.

**15.** *See* footnote 12, *supra.*

delivery of drugs or evidence of possession with intent to deliver, there is reasonable cause to believe both that the drugs will be destroyed and evidence lost and that the occupants of the house will be armed. Assuming the police announce their identity and purpose simultaneously with their entrance, the occupant's privacy rights are infringed only to the extent that the occupants are not given the opportunity to open the door. Even when the police dispense with the entire knock and announcement, *the societal interest in stopping the drug trade, combined with the police officers' safety interest, outweigh the occupants' limited privacy interests.* (Emphasis supplied.)

*Stevens,* 511 N.W.2d at 598. Under the facts of the case *sub judice,* the Court holds that the officers' execution of the warrant without a longer delay for a response to the announcement did not run afoul of the Fourth Amendment's prohibition against unreasonable searches and seizures.

## IV. CONCLUSION

The Court finds that § 3109 does not apply to the instant case because there was not sufficient federal involvement in the search and seizure. Alternatively, the Court holds that compliance with § 3109 was excused due to the exigent circumstances of the danger of destruction of evidence and/or the danger to the officers executing the warrant. Whether or not § 3109 applies, the Court further concludes that the actions of the officers were reasonable under the Fourth Amendment. Accordingly, the motion to suppress will be denied and such an order shall issue forthwith.